NEW JERSEY AUTOMOBILE,
INSURANCE PLAN, et al.,
Plaintiffs,

v.

Justin M. SCIARRA, et al., Defendants.

New Hampshire Insurance Company,
Inc., et al., Plaintiffs,

v.

Alert Motor Freight, Inc.,
et al., Defendants.

The Travelers Indemnity
Company, Plaintiff,

v.

E.F. Corporation, et al., Defendants.

Civil Action Nos. 92–1369,
96–5497, and 97–1900.

United States District Court,
D. New Jersey.

Dec. 30, 1998.

**392**

Alan M. Lieberman, James M. Holston, John K. Gisleson, Schnader Harrison Segal & Lewis, Philadelphia, PA, for Plaintiffs/Third–Party Defendants New Jersey Auto. Ins. Plan, Pennsylvania Assigned Risk Plan, CIGNA, and Third–party Defendant Michael Scott.

Paul W. Verner, Irwin F. Simon, Debra L. Rudoltz, Verner Simon & Rocha, LLP, New York City, for Defendants/Third–Party Defendants Justin M. Sciarra, Sciarra Ins. Agency, Inc., Paul W. Hopkins, Hopkins & Associates, Inc., Philadelphia Ins. Exchange, Inc., Reisch Enterprises, R.G. Truck Leasing, and Ardan, Inc.

William M. Hannay, Heidi Dalenberg, David H. Anderson, Steven C. Benz, Schiff Hardin & Waite, Chicago, IL, Marc L. Dembling, Berlin, Kaplan, Dembling & Burke, Morristown, NJ, for Third–Party Defendants AIPSO, Raymond A. Ursin, Travelers Indem. Co., Fireman's Fund Ins. Companies, Liberty Mutual Ins. Co., Progressive Cas. Ins. Co., Aetna Cas. & Sur. Co., and New Hampshire Ins. Co.

Richard D. Catenacci, Tricia Bevelock O'Reilly, Connell Foley & Geiser, Roseland, NJ, for Third–Party Defendants Paul Arnold Associates and Paul Goldman.

Edward Farman, Schindel, Cooper & Farman, New York City, for Third–Party Defendant Central Analysis Bureau.

Ira Lipsius, New York City, pro se.

William M. Hannay, Heidi Dalenberg, David H. Anderson, Steven C. Benz, Schiff Hardin & Waite, and Marc L. Dembling, Berlin, Kaplan, Dembling & Burke, Morristown, NJ, for Plaintiff New Hampshire Ins. Co. and Third–Party/Fourth–Party Defendants AIPSO, New Jersey Auto. Ins. Plan, New Hampshire Ins. Co., and James Bean.

Paul W. Verner, Debra L. Rudoltz, Verner Simon & Rocha, LLP, New York City, for Defendants/Third–Party Plaintiffs Alert Motor Freight, Inc. and John Stuffo.

Justin Sciarra, pro se.

Edward Farman, Schindel Cooper & Farman, New york City, for Central Analysis Bureau.

Richard M. Darnell, Louis J. Rizzo, Reger & Rizzo, Cherry Hill, NJ, for Plaintiff/Third–Party Defendant on the Counterclaim The Travelers Indem. Co.

James J. Riley, Albert J. Evans, Ernest Gellhorn, Riley and Fanelli, P.C., Pottsville, PA, for Defendant and Third–Party Plaintiff, E.F. Corp.

Joseph E. Mayk, Lewis R. Olshin, Duane, Morris & Heckscher LLP, Wayne, PA, for Third–Party Defendants AIPSO, Pennsylvania Assigned Risk Plan, and Raymond A. Ursin.

## *OPINION*

RODRIGUEZ, District Judge.

This matter is before the court on a host of summary judgment motions. Oral argument on the motions was held on Wednesday, November 4, 1998.

### *BACKGROUND*

The facts of this dispute are well-known to the Court. The original Complaint in the primary action, *New Jersey Automobile Insurance Plan v. Sciarra*, Civ. Action No. 92–1369,[1] was filed on March 31, 1992 and essentially alleges that Defendants—most of whom have settled with Plaintiffs and are no longer parties to this action—defrauded commercial automobile insurers by assisting trucker-insured in

---

1. The original Plaintiffs were New Jersey Automobile Insurance Plan, Pennsylvania Assigned Risk Plan and Indemnity Insurance Company of North America.

making false representations in their insurance applications within the involuntary insurance market. This involuntary insurance market was created under both Pennsylvania and New Jersey law to provide insurance Plans for those commercial trucking companies who were unable to obtain reasonably priced liability coverage through ordinary methods. The Commercial Auto Insurance Plans ("CAIPs") assign insurance carriers to supply coverage. The Automobile Insurance Plans Services Office ("AIPSO"), a private company, administers both the New Jersey and Pennsylvania CAIPs, as well as drafts the manuals containing the rules implementing the CAIPs.

The Plan rules permitted three methods of computing the premiums for truckers, all of which were intended to produce comparable premium amounts. Defendant/Third–Party Plaintiff Paul W. Hopkins apparently utilized a "loophole" in the rules for one of the methods that, when combined with other manipulations of the rules, resulted in substantial reductions in insurance premium costs to the truckers under both the New Jersey and Pennsylvania Plans. Marketing himself as an insurance consultant and operating through Defendant Justin Sciarra and his insurance agency, Hopkins charged clients based on the savings he could produce rather than the more common charge of a percentage of the premium.

Specifically, the method used by Defendants (collectively referred to as "Sciarra/Hopkins") is called the "cost of hire" method. This method, used for vehicles leased on a short-term basis (i.e., less than six months), basically employs a two-step formula: First, the "average specified car rate" must be calculated. This is determined by adding together all of the rates for the vehicles scheduled on the policy and dividing by the number of scheduled vehicles. This figure is then multiplied by .0033. Second, the average specified car rate (per 100) is multiplied by the "cost of hire" figure. This "cost of hire" is deter-

mined by adding a number of operating costs together. The Sciarra/Hopkins methodology produces a significantly lower premium primarily by manipulating the number of scheduled vehicles a trucking company reports and by narrowly construing what is included in the "cost of hire."

To take advantage of the "cost of hire" method, Sciarra/Hopkins would instruct the trucking company to create another company to serve as the owner of the fleet of trucks. The trucking company would then lease the trucks back from its newly created company under short-term leases, decreasing the number of vehicles it would have to report. Another unique feature of the Sciarra/Hopkins methodology is that it limits "total cost of hire" to include only driver wages and truck rent, rather than including such things as fuel, tolls, maintenance and other costs involved in leasing a truck on a short-term basis.

Contesting the validity of the Sciarra/Hopkins method of computing premium rates, Plaintiffs and Third–Party Defendants claim that Sciarra/Hopkins advised, counseled, encouraged and directed motor carriers to inaccurately report the number of vehicles owned by the motor carriers, manipulated the cost of hire and radius of operations, and obscured previous adverse lost histories. Plaintiffs base their claims on violations of the RICO Act and the New Jersey Racketeering Statute, as well as common law fraud, breach of contract, and unjust enrichment.

In defense to Plaintiff's claims and in support of their counterclaims and third-party claims against Third–Party Defendants, Sciarra/Hopkins maintain that the methodology they used to compute the application figures was entirely proper under the Plan rules. They further claim that Plaintiffs engaged in a conspiracy among themselves and others to monopolize the involuntary insurance market by manipulating the insurance rating procedures. Specifically, Sciarra/Hopkins' Third–Party Complaint alleges that Plaintiffs/Third–Party Defendants conspired, in

restraint of trade and in violation of federal antitrust laws, to create a monopoly of the involuntary insurance market by retroactively altering the Plan rules to make Sciarra/Hopkins' methodology appear fraudulent and attempting to force them out of business. In furtherance of this goal, Sciarra/Hopkins argue that Third-Party Defendants also published numerous disparaging remarks about Sciarra/Hopkins and their services to Plan representatives and others in the insurance industry.

Sometime in 1992, New Hampshire Insurance Company ("New Hampshire"), one of the servicing carriers that was engaged to insure Sciarra/Hopkins' clients under the New Jersey Plan, filed suit in the Superior Court of New Jersey, Burlington County against Alert Motor Freight, Inc. ("Alert"). New Hampshire alleged that Alert, one of Sciarra/Hopkins' trucker clients, owed it $139,512.20 for liability insurance. This matter was ultimately removed to the District of New Jersey before Judge Stephen M. Orlofsky and was reassigned to this Court on December 19, 1996. *New Hampshire Insurance Company, Inc. v. Alert Motor Freight, Inc.,* No. 96–5497.

On or about August 3, 1995, The Travelers Indemnity Company ("Travelers"), another one of the servicing carriers that insured Sciarra/Hopkins' clients under both the Pennsylvania and New Jersey Plans,[2] filed suit against E.F. Corporation ("E.F."), in the Common Pleas Court of Pennsylvania, Berks County. Similarly, Travelers sought to recoup money lost on the premiums it claims Sciarra/Hopkins inappropriately calculated for E.F., another one of Sciarra/Hopkins' trucker clients. After E.F. filed a timely notice of removal,

this case was finally removed to the District Court for the Eastern District of Pennsylvania and was eventually transferred to the District of New Jersey before Judge Joseph E. Irenas. *The Travelers Indemnity Company v. E.F. Corporation,* Civ. A. No. 97–1900. This case was consolidated with *New Jersey Automobile Insurance Plan v. Sciarra,* Civ. A. No. 92–1369 and *New Hampshire Insurance Company, Inc. v. Alert Motor Freight, Inc.,* No. 96–5497, by Magistrate Judge Robert B. Kugler in an order dated September 12, 1997.

After years of discovery and an ever increasing hostility among the parties, Judge Kugler ordered discovery closed on September 2, 1997. Also in this June 16, 1997 Amended Scheduling Order, the parties were given time lines for filing dispositive motions. Approximately fifteen of these motions for summary judgment are presently before the Court.[3]

## DISCUSSION

### A. Summary Judgment Standard

The entry of summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about it might affect the outcome

---

**2.** Travelers ceased acting as a servicing carrier for both plans by late 1991. Pls./Third-Party Defs.' Joint Stmt. of Uncontested Material Facts at ¶ 88.

**3.** These three consolidated cases show a clear alignment of interests among certain parties. The Defendants in all these cases are the Sciarra/Hopkins Defendants or their clients, while the Plaintiffs and Third-Party Defen-

dants are the insurance plans or insurance companies. Thus, where the interests are the same, references to "Plaintiffs and Third-Party Defendants" refer to those parties in all cases; likewise, references to "Sciarra/Hopkins and their clients" refer to the Sciarra/Hopkins Defendants and their trucker clients in all cases.

of the suit. *Id.* In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party may not rest upon mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

However, in deciding the motion, the court does not "weigh the evidence and determine the truth of the matter, but [instead] determine[s] whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the non-movant has provided evidence exceeding the "mere scintilla" threshold in demonstrating a genuine issue of material fact, the court cannot weigh the evidence and credit the movant's interpretation of the evidence. This is so even if the movant's evidence far outweighs the non-movant's evidence. Credibility determinations are the province of the fact-finder.[4] *Big Apple BMW, Inc. v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### B. The Sciarra/Hopkins' Methodology

#### 1. Propriety of Partial Summary Judgment

The Sciarra/Hopkins methodology is, in one way or another, at the heart of this dispute. Essentially seeking a declaratory judgment (although not including any claims for declaratory relief in their Third–Party Complaint), Defendants and Third–Party Plaintiffs moved for partial summary judgment, asking this Court to declare that their methodology was proper under the Plan rules.[5] Plaintiffs and Third–Party Defendants claim that it is improper for Defendants to seek summary judgment only on the limited issue of their interpretation of the Plans' rules.

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Subsection (a) of this rule permits a claim-

---

4. It is important to note that pursuant to Local Rule 56.1, each side is required to submit "a statement which sets forth material facts as to which there exits or does not exist a genuine issue." This is intended to "narrow the issues before the District Court, and it has come to be relied upon by the Court as a vital procedural step." L. Civ. R. 56.1, cmt. 2. In its "Consolidated Statement of Uncontested Facts in Opposition to Various Parties' Motions for Summary Judgment Pursuant to Local Rule 56.1" however, Paul Verner, Esq., counsel for Sciarra/Hopkins, Alert and John Stuffo, includes abundant conclusions and arguments, frequently blurring the line between fact and opinion. Furthermore, many of these arguments cloaked as "undisputed facts" are fervently disputed by the parties. This poses a problem in deciding the weight to be given to this submission. *See Williams v. Borough of West Chester,* 891 F.2d 458, 471 (3d Cir.1989) ("[E]vidence whose foundation is deficient must be excluded from consideration [in motions for summary judgment under Rule 56].") It is clear that much of the Verner submission is highly improper under the Local Rules and will be considered only to the extent deemed appropriate.

5. E.F. sought a determination on the definitions of "specified car rate" and "cost of hire" pursuant to the Pennsylvania Plan and Sciarra/Hopkins sought the general declaration that their methodology was proper under the Plan rules. Since both clams essentially seek the same type of relief, they will be considered together.

ant who seeks to recover "upon a claim, counterclaim or cross-claim or to obtain a declaratory judgment" to move for summary judgment and subsection (b) permits the motion to be filed by a defending party "against whom a claim, counterclaim or cross-claim has been asserted or a declaratory judgment is sought[.]" Subsection (c) gives the standard to be employed, also stating that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Finally, subsection (d) allows the court, in its discretion, to enter an interlocutory order "specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the actions as are just."

■ Nothing in this rule can be read to allow partial summary judgment on only one portion of a claim. *RePass v. Vreeland,* 357 F.2d 801, 805 (3d Cir.1966); *Coffman v. Federal Lab.,* 171 F.2d 94, 98 (3d Cir.1948), *cert. denied,* 336 U.S. 913, 69 S.Ct. 603, 93 L.Ed. 1076 (1949); *Kendall McGaw Lab., Inc. v. Community Mem'l Hosp.,* 125 F.R.D. 420, 421 (D.N.J.1989); *Westinghouse Elec. Corp. v. Fidelity & Deposit Co.,* 63 B.R. 18, 22 (W.D.Pa.1986). Subsections (a) and (b) state what party may file this motion, and only speak in terms of "a claim, counterclaim or cross-claim[.]" Discussing these subsections, Judge Fisher observed that "[s]ummary judgment may be had as to one claim among many, but it is well settled that neither subsection allows such a judgment as to one portion of a claim." *Kendall,* 125 F.R.D. at 421 (citing *RePass,* 357 F.2d at 805). Likewise, subsection (d) allows the court to issue interlocutory orders to narrow the issues before trial, but only where the facts "appear without substantial controversy[.]" Thus, nothing in this rule permits summary judgment motions intended "to dispose of only part of a single claim." *Westinghouse,* 63 B.R. at 22.

It would therefore seem that Sciarra/Hopkins and their clients are precluded from compelling this Court to determine the propriety of their methodology through a summary judgment motion. They contend, however, that the issue of their methodology will in fact dispose of a single claim, because if it is determined that it was proper under the Plan rules, the court would be compelled to dismiss Plaintiffs' fraud claim. Defs.' Reply Mem. Supp. Partial Summ. J. at 2. Therefore, they argue that "the determination will dispose of an entire single claim." *Id.*

In *Kendall,* the court was presented with the cross-motions of both the plaintiff and the defendant that asked the court to decide "the appropriate measure of damages should a trial, or later motion practice, resolve the crucial issue." 125 F.R.D. at 421. The court held this type of relief to be improper for a summary judgment motion under Rule 56. *Id.* at 422 ("A Rule 56 movant may not 'play leapfrog' with his case by seeking a decision whose validity depends on one or more unresolved issues."). Thus, the court held that summary judgment was not an appropriate method to address a single issue from the rest of the case because it would not have disposed of an entire claim, counterclaim or cross-claim.

Similarly, in the present case, the validity of the Sciarra/Hopkins methodology is a single issue, not any type of claim. Although this is a very significant issue, its relative importance does not convert it into a "claim, counterclaim or cross-claim[.]" Sciarra/Hopkins and their clients do not seek declaratory relief in their Third–Party Complaint, and cannot now use Rule 56 as a vehicle to get a declaration on this narrow issue. More importantly, even if this issue was decided in their favor, it would not automatically dispose of any of Plaintiffs' claims. At best, it remains an issue involved in Plaintiffs' fraud claim. Thus, Defendants and Third–Party Plaintiffs' argument impermissibly stretches the concept that partial summary judgment on

a portion of a claim is inappropriate and cannot be accepted. Partial summary judgment regarding the Sciarra/Hopkins methodology is inappropriate and is denied.

### 2. Collateral Estoppel

Sciarra/Hopkins and their clients also argue that Plaintiffs and Third–Party Defendants are barred from relitigating the issue of the interpretation of the Sciarra/Hopkins methodology because it was already decided in their favor in *Aero Trucking v. Aetna Cas. & Sur. Co.*, C.A. No. 88C–FE–101 (Oct. 12, 1995), an unreported opinion of a Delaware state trial court.

■ Collateral estoppel requires that: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir.1995) (citing *United Indus. Workers v. Government of the Virgin Islands*, 987 F.2d 162, 169 (3d Cir.1993)). As the fourth factor shows, the party against whom collateral estoppel is asserted must have been involved in some way in the prior adjudication. Under New Jersey law, "[t]he scope of privity, while largely freed from the very constrictive common law mutuality anchor, remains small." *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir.1994) (citing *Romano v. Kimmelman*, 190 N.J.Super. 554, 464 A.2d 1170 (1983), *aff'd*, 96 N.J. 66, 474 A.2d 1 (1984)). "A relationship is usually considered "close enough" only when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Id.* Defendants and Third–Party Plaintiffs claim that "the parties in [*Aero Trucking* and the instant case] are so substantially similar as to be identical." Defs.' Reply Mem. Supp. Partial Summ. J. at 4. *Aero Trucking* involved a Delaware trucking company who sought insurance in the involuntary market through the Delaware Plan, which like the New Jersey and Pennsylvania Plans, was administered by AIPSO. One of the servicing carriers involved was The Aetna Casualty and Surety Company ("Aetna"), which was also used as a servicing carrier under the New Jersey Plan and captioned as a third-party defendant in the *Sciarra* case. Based on this, Sciarra/Hopkins and their clients concluded that "it would be absurd to argue that there was no privity between the parties to the two litigations." Defs.' Reply Mem. Supp. Partial Summ. J. at 5.

■ Contrary to Defendants and Third–Party Plaintiffs' strong assertions, *Aero Trucking* has absolutely no preclusive effect on the present case. None of the Defendants or Third–Party Plaintiffs were involved in the Delaware case, nor were any of the Plaintiffs or Third–Party Defendants other than Aetna. It has not been shown that Aetna had any express or implied legal relationship with Plaintiffs or Third–Party Defendants that would allow it to function as a "virtual representative" for purposes of collateral estoppel. *Collins*, 34 F.3d at 176.

Furthermore, and perhaps more significantly, the cases do not involve the "identical issue." *Aero Trucking* concerned the interpretation of the Delaware Plan rules. Admittedly, the Delaware Plan was also administered by AIPSO, but its rules are not identical to the New Jersey or Pennsylvania Plans. Additionally, each plan was enacted by its respective state legislature with a potentially different legislative history. The states do not merely ratify a single plan, as in the case of adopting a uniform agreement, but they create their own plan. Moreover, AIPSO contracts with the particular plans individually, not with any one insurance company like Aetna. Thus, collateral estoppel does not apply and Plaintiffs and Third–Party Defendants are not estopped from challenging the validity of the Sciarra/Hopkins methodology.

### 3. *Waiver*

 Defendants and Third–Party Plaintiffs argue that Plaintiffs waived their right to enforce the Plan rules against Sciarra/Hopkins and their clients because Plaintiffs did not warn Sciarra/Hopkins or their clients that their method of computing the premiums was improper, thereby implicitly authorizing their interpretation. This alleged waiver occurred through a correspondence sent by Edward Fackenthal on behalf of his motor carrier client (not a party to this action) to John Verruso, manager of the Pennsylvania Plan, allegedly seeking the Plan's views on the Sciarra/Hopkins method. (Letter from Fackenthal to PA Plan dated 5/4/87). Verruso responded simply that it was beyond the Plan's responsibility to answer Fackenthal's questions, and suggested that he contact an insurance producer or consultant. (Letter from Verruso to Fackenthal dated 5/28/87).

The United States Court of Appeals for the Third Circuit discussed the concept of a legal waiver in *Billman v. V.I. Equities Corp.*, 743 F.2d 1021 (3d Cir.1984). There, the landlords brought an unlawful detainer action against the lessors of their property, claiming the lessors had not properly exercised their option to renew the lease. *Id.* at 1023. The landlords, however, had previously received the lessors' notice of intent to exercise the option and had in the interim conducted business dealings on the explicit assumption that the lease was renewed. *Id.* The court discussed the standard for waiver under these circumstances: "First, the landlords must have promised not to enforce the condition of the option. Second, the lessee must have relied to its detriment on the landlords' promise. And third, in view of the detrimental reliance, justice must require enforcement of a waiver." *Id.* (citing Restatement (Second) of Contracts § 89; 5

Williston on Contracts § 689 at 308–09).[6] Finding all factors present, the court held that the landlords waived their right to insist on strict compliance with the renewal term of the lease. *Id.* at 1025.

In the present case, however, there was no promise, explicit or implicit, not to enforce any provision of the Plan. In fact, the letter from Verruso to Fackenthal implies nothing about the interpretation of the Plan. Moreover, Sciarra/Hopkins and their clients point to no detrimental reliance; they do not even show that they were aware of this correspondence. It also follows that, since there was no detrimental reliance, it cannot be said that justice supports the finding of a waiver.

### 4. *Ambiguity in Plan Rules*

Defendants and Third–Party Plaintiffs contend that the definitions of "average specified car rate" and "cost of hire" are ambiguous, and as such, should be construed strictly against the insurance Plans.

"[I]n establishing ambiguity, the insured must do more than suggest a possible alternative reading of the contract; it must also offer an 'objectively reasonable reading of the disputed passage.'" *Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir.1997) (quoting *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1182 (3d Cir.1991)). The Third Circuit stated:

> We look to the number of reasonable interpretations a contract, provision, or term may receive in determining ambiguity. If we find but one reasonable interpretation, then *a fortiori* there can be no ambiguity. However, if the language is susceptible to more than one reasonable interpretation, then it will be found to be ambiguous.

*Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 231 (3d Cir.1994) (citations omitted) (citing *Taylor v. Continen-*

---

**6.** The court also observed that "[t]his genre of waiver is distinguishable from equitable estoppel, since 'there is no misrepresentation of an existing fact.' It is akin to promissory estoppel." *Billman,* 743 F.2d at 1024 (internal citation omitted) (citing 5 Williston on Contracts § 679 at 253; Restatement of Contracts §§ 89 & 90).

*tal Group,* 933 F.2d 1227, 1232 (3d Cir. 1991) and *Stendardo v. Federal Nat'l Mortgage Ass'n,* 991 F.2d 1089, 1094 (3d Cir.1993)). Generally, when determining whether an ambiguity exists, the court must look to the doctrine of *contra proferentum,* which holds that "ambiguities in an insurance policy are to be resolved in favor of the insured." *Curcio,* 33 F.3d at 231 (citing *Heasley v. Belden & Blake Corp.,* 2 F.3d 1249, 1257 (3d Cir.1993)). This doctrine embodies the policy that, since most insurance contracts are drafted by the insurers themselves and are generally not the result of arms-length negotiations, they are presumed to be contracts of adhesion. *See Pittston,* 124 F.3d at 520–21 ("[B]ecause insurance contracts are in most instances 'nonnegotiable,' it is not unfair that the insurer 'bear the burden of any resulting confusion.' ") (citing *Gaunt v. John Hancock Mut. Life Ins. Co.,* 160 F.2d 599, 602 (2d Cir.), *cert. denied,* 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947)).

■ *Contra proferentum* is inapplicable to the present case, however, because it does not involve contracts of adhesion or contracts otherwise drafted by parties with superior knowledge of the industry; rather, the rules challenged in this case were approved by the New Jersey and Pennsylvania Departments of Insurance. *See Pittston,* 124 F.3d at 521 (holding *contra proferentum* does not apply where insurance contract is negotiated, jointly drafted or drafted by insured). Therefore, even if ambiguities where found in either of the Plan rules, this does not mean that the Sciarra/Hopkins methodology is automatically correct. In fact, "once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning." *In re New Valley Corp.,* 89 F.3d 143, 150 (3d Cir.1996) (citing *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir.1994); *Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227, 1234 (3d Cir.1991)); *see also American Cyanamid Co. v. Fermenta Animal Health Co.,* 54 F.3d 177, 181 (3d Cir.1995) ("Before mak-ing a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation."). There is enough relevant extrinsic evidence in this case to merit submitting the case to a jury. Accordingly, Sciarra/Hopkins and their clients' argument is rejected.

C. *Defendants Justin M. Sciarra, Sciarra Insurance Agency, Inc. Paul W. Hopkins and Hopkins & Associates, Inc., Philadelphia Insurance Exchange, Inc., Reisch Enterprises, R.G. Trucking, Inc., and Ardan, Inc. Sciarra/Hopkins Motion for Summary Judgment Dismissing Plaintiff's Complaint* [461]

Sciarra/Hopkins offer many reasons why each count of Plaintiffs' Complaint should be dismissed. They claim that Plaintiffs have not proved common law fraud; that Plaintiffs' RICO counts are insufficient as a matter of law; that Plaintiffs have not proved Defendants were unjustly enriched; and that the applicable statutes of limitation have expired. Specifically, Sciarra/Hopkins allege that Plaintiffs, through their actions, condoned the Sciarra/Hopkins methodology five years before they brought suit. Further, they claim that Plaintiffs failed to follow the procedures outlined in the CAIP manuals regarding broker fraud—i.e., Plaintiffs have failed to exhaust their administrative remedies. Finally, Sciarra/Hopkins claim that the civil RICO and fraud counts must be dismissed due to insufficient pleading.

1. *Common Law Fraud*

■ Under New Jersey law, common law fraud requires: "(1) a material representation of a past or present fact; (2) knowledge by the defendant of its falsity; (3) intention that it be relied upon; (4) reasonable reliance by the other person; and (5) resulting damages." *Carroll v. Cellco Partnership,* 313 N.J.Super. 488,

501, 713 A.2d 509 (App.Div.1998) (citing *Gross v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 303 N.J.Super. 336, 344, 696 A.2d 793 (Law Div.1997)); *Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981) ("A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment."). Pennsylvania law similarly requires a plaintiff to prove: "(1) the defendant made a misrepresentation that is material to the transaction at hand; (2) the misrepresentation was made with knowledge of the statement's falsity or with reckless disregard as to whether it was true or false; (3) the defendant made the misrepresentation with the intent of inducing reliance; (4) the plaintiff justifiably relied upon the misrepresentation; and (5) the resulting injury was proximately caused by the reliance." *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, (Pa.Super.1997) (citing *Gibbs v. Ernst*, 538 Pa. 193, 207, 647 A.2d 882 (1994)).

▮ First, Sciarra/Hopkins argue that Plaintiffs' fraud claims are invalid because Plaintiffs cannot prove reliance, materiality or damages. This is because Sciarra/Hopkins claims that they never "intended the Plaintiffs to rely **solely** upon the insurance applications in writing the policies." Sciarra/Hopkins' Br. Supp. Summ. J. at 8 (emphasis in original). Instead, they argue that:

It was common knowledge in both the insurance and trucking industries that the applications were a mere starting point of an extensive and unending series of standard information gathering by the insurers including the ability of the insurer to request further specific information from the broker and insured at any time.

*Id.* Thus, even if they did attempt to defraud Plaintiffs, it was only an attempt to defraud them partially, which they claim

destroys any notion of reliance. This contention also weighs toward the reasonableness of Plaintiffs' reliance on the application.

In *Jewish Center of Sussex County v. Whale*, a religious congregation sought rescission of the employment contract it had with its rabbi because it claimed that the rabbi had fraudulently misrepresented his background by failing to disclose that he had a prior criminal record and was disbarred from the practice of law. 86 N.J. 619, 432 A.2d 521 (1981). Summary judgment was granted for the plaintiff congregation, and was affirmed by the Appellate Division. Similar to Sciarra/Hopkins' claim that the insurance application was not intended to be the only source relied upon, the rabbi argued that the employment application did not require him to disclose his past, therefore implying that it was the congregations fault for relying solely on the application and not investigating other sources. *Id.* at 625–26, 432 A.2d 521. Rejecting this argument, the supreme court responded: "Defendant apparently offers these assertions to show that plaintiff's reliance was unreasonable. One who engages in fraud, however, may not urge that one's victim should have been more circumspect or astute." *Id.* at 626 n. 1, 432 A.2d 521 (citing *Pioneer Nat'l Title Ins. Co. v. Lucas*, 155 N.J.Super. 332, 342, 382 A.2d 933 (App.Div.), *aff'd*, 78 N.J. 320, 394 A.2d 360 (1978)).

Moreover, there is sufficient evidence in the record to show that the insurance applications were material and relied upon by Plaintiffs and other insurers within the industry. Sciarra/Hopkins themselves admit that they "do not deny that they submitted applications to the Plans with the intention that the Plaintiffs would provide them with insurance policies." *Id.* Their view that reliance or materiality can only be found where the application embodies the only source of necessary information is overly narrow and is rejected.

Regarding damages, Sciarra/Hopkins claim that rescission is not a proper reme-

dy to assigned risk providers like Plaintiffs. They further argue that even if material misrepresentations were found, the contract could be voided *ab initio* and Plaintiffs would just return all premiums and be absolved of liability for claims brought under the policy. Since Plaintiffs have not sought to void the contracts, Sciarra/Hopkins argue that no "reasonable" trier of fact could conclude that Plaintiffs "determined to remain on risk subsequent to their 'discovery' of 'misrepresentation' by the defendants." The court finds that this line of thinking does not serve to establish the absence of a genuine issue of material fact for Sciarra/Hopkins.

Sciarra/Hopkins next argue that Plaintiffs' claim of misrepresentation of information on the applications should be dismissed, basically because the Sciarra/Hopkins methodology is correct under Plan rules. The court sees this section of argument as nothing more than a rehash of the argument that this court can make a determination on the Sciarra/Hopkins methodology. As discussed above, therefore, this argument is improper.

Next, Sciarra/Hopkins argue that Plaintiffs' failure to cancel any of the Defendants' policies for misrepresentation, in accordance with Plan rules, constitutes a waiver of the claims of misrepresentation and fraud. Sciarra/Hopkins argue that by failing to follow Plan rules and by offering renewed terms based on additional risks not known to them, Plaintiffs "promised" not to enforce cancellation of the policy for misrepresentation at a later date. Sciarra/Hopkins also argue that they relied to their detriment on Plaintiff's conduct because if there were a proper cancellation the truckers would have had a right of appeal.[7]

Similarly, Sciarra/Hopkins argue that Plaintiffs are equitably estopped from claiming misrepresentation because Plain-

tiffs' conduct in failing to cancel the policies for misrepresentation caused Sciarra/Hopkins to believe that Plaintiffs did not believe there had been misrepresentations, but only additional claimed exposures. Further, Sciarra/Hopkins contend that Plaintiffs acquiesced that the information in the policies was proper within the meaning of the Plan rules, because Plaintiffs failed to follow proper cancellation procedures. Again, Defendants argue that they relied upon Plaintiffs' conduct to their detriment.

In response to the waiver/estoppel arguments, Plaintiffs cite *Mellon Bank v. First Union Real Estate Equity & Mortgage Investments*, 951 F.2d 1399, 1408 (3d Cir. 1991), and contend that the Plan rules and the doctrine of election of remedies permitted them to sue for damages without canceling the policies for misrepresentation. Plaintiffs cite to the Plan rules, which provide, "Nothing herein shall affect the [insureds'] right to rescind the policy for fraud and misrepresentation or to invoke other remedies as provided by law." (PA Plan, § 18(B)(9); NJ Plan, § 19(c)) They also cite to the portion of the *Mellon* case which reads, "When a contract is induced by fraud, ... the injured party has a choice of alternate remedies: he may either rescind the contract or affirm it and maintain an action in deceit for damages." 951 F.2d at 1408. Additionally, Plaintiffs argue that the applicability of the doctrines of estoppel and waiver requires resolution of facts that are in dispute, such as whether Plaintiffs knew of the misrepresentations within 120 days of policy inception, and whether Defendants would have appealed any notice of cancellation for misrepresentation since they had the right to appeal any cancellation regardless of reason but failed to do so for six of the seven truckers whose insurance was canceled. This failure to appeal, argue Plaintiffs, at

---

7. Defendants also argue that Plaintiffs' failure to properly audit the subject policies also constitutes waiver or forms the basis for estoppel.

Plaintiffs allegedly failed to follow Plan rules because they came up with a premium estimate without performing a proper audit.

the very least raises a factual question as to Defendants' reliance.

Again, the court does not believe that the Defendants have shown the presence of the *Billman* factors in order to support a finding of waiver in this case. Specifically, there was no promise, explicit or implicit, not to hold the Defendants liable for fraud or misrepresentation. Similarly, the court cannot find that Plaintiffs are estopped from bringing a claim for fraud or misrepresentation.

Defendants next argue that Plaintiffs do not have standing to bring this claim because neither the NJ Plan nor the PA Plan was ever authorized by the insurance commissioners to commence actions at law against Plan participants for premium collection. Defendants, however, have failed to explain how the only case that they cite, *Chopper Express, Inc. v. Department of Ins. of the State of N.J.*, 293 N.J.Super. 536, 681 A.2d 1226 (1996), supports their argument. This court reads that case as deciding only whether the Appeals Subcommittee of the governing committee established under the NJ Plan is authorized to *adjudicate* a dispute regarding the amount of premiums owed by a party insured under the Plan. 293 N.J.Super. at 538, 681 A.2d at 1227. Therefore, Defendants have not proven their lack of standing argument.

■ Sciarra/Hopkins also argue that Plaintiffs' claims should be dismissed because they failed to follow the Plans' administrative remedies for addressing suspected insurance agent fraud. Defendants cite to Rule 19A of the NJ Plan, which states, "[t]he Committee will hear any appeal from an applicant, Insured, producer, or a Servicing Carrier on a matter pertaining to the proper administration of the Plan." Because the rule refers to servicing carriers, Defendants contend that it is mandatory that IINA pursue an appeal before it may institute a collection or fraud action. They state that they "are not arguing that every fraud or collection action requires the servicing carrier to pursue an administrative appeal. Rather, the language of the Rule itself indicates that an appeal was the proper remedy *in the case at bar*" because the case involves questions about the proper administration of the Plan.

Plaintiffs respond first that this defense is waived because Sciarra/Hopkins did not assert it as an affirmative defense. Plaintiffs also argue that they were not required to pursue these administrative remedies because: (1) the Plans did not have a procedure for recovery of unpaid premiums, making the administrative remedy inadequate; (2) a jury can determine whether the applications were fraudulently misrepresented, so the case does not require the expertise of the Plans; (3) a factual record has already been developed without the need for Plan intervention; and (4) discovery has been concluded and more than four years have passed without Sciarra/Hopkins asserting this defense, and therefore the defense is waived; resorting to an administrative process at this point would be unnecessary and inefficient.

The court does not see the Plan rules as establishing a mandatory avenue of administrative process that must be exhausted before resort to this court. Because Sciarra/Hopkins have not pointed to any authority mandating such exhaustion, Plaintiffs' claim will not be dismissed at this point in the litigation.

■ Sciarra/Hopkins argue that, as to Plaintiff's fraud claim, any damages sought against Brennan Transportation are void as a matter of law, because Plaintiffs failed to follow N.J. Admin. Code § 11:1–20 in changing Brennan's premium rates midterm without approval from the Department of Insurance. (This same argument is made against New Hampshire by Alert.) Plaintiffs rebut this argument by stating that the premium increase was a permissible adjustment based on exposures discovered during the policy period. The court finds Plaintiffs' point one well taken in light of the applicable law, as "the rule

does not prohibit a premium increase where necessary to reflect coverage of an increased risk." *In the Matter of N.J.A.C. 11:1–20,* 208 N.J.Super. 182, 505 A.2d 177 (1986). Further, it should be noted that "[n]othing [within the statute] shall be deemed to create any right or cause of action on behalf of any insured to enforce the penalties set forth in this subsection." N.J.A.C. 11:1–20.11.

### 2. *RICO Claim*

■ Defendants argue that the Plaintiffs have not alleged the existence of a RICO enterprise, because they have not alleged that the Defendants make up an enterprise that is distinct from the Defendants as individuals. Moreover, the Defendants claim that the truckers were not related in any manner except for their using Sciarra or Hopkins as insurance agents (and being named as defendants in this action). Defendants also argue that Plaintiffs have failed to prove a pattern of racketeering activity. To support this argument, Defendants state that Plaintiffs have failed to state who caused what to be mailed when, and how that mailing furthered the fraudulent scheme. The Defendants also state, "Specific acts of fraud and misrepresentations are left entirely to the imagination. Although dates and transactions are alleged, the Complaint does not specify fraud or misrepresentation." They contend that Plaintiffs have failed to plead facts to meet the statutory requirement of two predicate acts or the threat of long term criminal activity. Finally, Defendants argue that Plaintiffs cannot demonstrate that they relied on the applications to their detriment.

Plaintiffs, on the other hand, have argued that they properly alleged RICO violations that are factually supported because the RICO enterprises of Sciarra Insurance Agency, Hopkins & Associates, and Philadelphia Insurance Exchange are distinct from the RICO persons, Justin Sciarra, Paul Hopkins, and the defendant truckers, and those persons were associated with the enterprises either as principals (Sciarra and Hopkins) or as clients in contractual relationships (the truckers). Plaintiffs argue that as principals of the enterprises, Sciarra/Hopkins directed the enterprises' affairs. Additionally, Plaintiffs allege a pattern of fraudulent activity in Defendants' submitting more than seven materially misrepresented applications to the Plans in an open-ended scheme. Plaintiffs state that they have alleged with particularity what was mailed, when it was mailed, and what misrepresentations were contained in each mailing as to each trucker. They note that they have submitted an affidavit which details mailings in support of the mail fraud alleged in their RICO claim. Plaintiffs also note that, contrary to Defendants' assertions, they need not show detrimental reliance to prevail on a RICO claim under § 1962(c).

The court finds that, in relation to Plaintiffs' RICO claim, Defendants have failed to show that there is no genuine issue of material fact or that they are entitled to judgment as a matter of law; Plaintiffs have sufficiently alleged the existence of a RICO enterprise.

### 3. *Unjust Enrichment*

■ Defendants argue that Plaintiffs' unjust enrichment claim as to the truckers, R.G., Reisch, and Ardan, must fail because the theory of unjust enrichment cannot be applied where the relationship between the parties is founded on a written contract, here, the insurance policies. They further argue that in the case of Sciarra and Hopkins, where a quasi-contract (the Plan Manual and Rules) governed, the Plaintiffs have not proven that they conferred a benefit upon Sciarra and Hopkins (because the truckers are the ones who payed Sciarra and Hopkins), or that Sciarra and Hopkins appreciated such benefits.

Plaintiffs concede that R.G. Truck Leasing is not liable for unjust enrichment because it has an express insurance contract with IINA. However, they assert that

they have established claims for unjust enrichment against the other individual Defendants, including Sciarra/Hopkins, and the trucking companies who were not parties to the insurance policies (Reisch Enterprises and Ardan). Plaintiffs state that those Defendants received a benefit in the amount of the under reported premiums, and it is unjust for them to retain that benefit because they or their trucking companies received valuable liability insurance coverage essential to their trucking operations without paying for that coverage. Plaintiffs further state that Sciarra/Hopkins received a benefit from the insurance policies having been issued to the trucking companies because they received fees for the placement of the insurance, including fees calculated on the basis of insurance savings.

"Recovery for unjust enrichment requires that plaintiff 'show both that defendant received a benefit and that retention of that benefit without payment would be unjust.'" *Caputo v. Nice–Pak Products, Inc.,* 300 N.J.Super. 498, 507, 693 A.2d 494 (App.Div.) (quoting *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994)), *certif. denied,* 151 N.J. 463, 700 A.2d 876 (1997). The Plaintiffs' theory is that Reisch and Ardan did receive insurance coverage without paying the premiums that would have covered the actual risk. Thus, they were directly and personally benefitted by the alleged scheme to obtain less expensive insurance rates. The claim for unjust enrichment against them will be allowed to stand. Similarly, Plaintiffs will be able to recover on a theory of unjust enrichment if Sciarra/Hopkins were directly and personally benefitted by the use of their methodology where, for example, their commissions were based on the amount of premium savings they provided for their clients.

### 4. *Statute of Limitations*

■ Defendants allege that the Plaintiffs' RICO claim accrued in 1987 when Plaintiffs discovered Defendants allegedly wrongful acts (this is when Plaintiffs "admit" that they were aware of Defendants' method of submitting insurance applications). Therefore, as this lawsuit was not initiated until 1992, Defendants contend that Plaintiffs' civil RICO claim is barred by the four-year statute of limitations.

Plaintiffs, on the other hand, point out that the first application at issue here was not submitted until March 1, 1989, less than four years before the Complaint's March 31, 1992 filing date. They argue that it is absurd for Sciarra/Hopkins to be arguing that Plaintiffs should have asserted RICO claims based on fraudulent applications before those applications were even submitted. The court tends to agree.

The Defendants also attempted to argue that Plaintiffs' fraud/misrepresentation counts were barred by a two-year statute of limitations, but they dropped this argument once the Plaintiffs pointed out that fraud is governed by a six-year statute in New Jersey, which was met, and that the claims against the Pennsylvania truckers accrued within the two-year period applicable in that Commonwealth.

### D. *Defendants/Third–Party Plaintiffs Alert and John Stuffo's Motion for Summary Judgment* [38, 463]

In advancing the position that New Hampshire's common law fraud claim against them should be dismissed, Alert Motor Freight and John Stuffo make exactly the same arguments as Sciarra/Hopkins made in their motion for summary judgment on Plaintiff's Complaint in the New Jersey Auto matter. The parties are therefore referred to the above discussion of the common law fraud arguments. Alert and Stuffo make additional arguments that New Hampshire's claims should be dismissed due to failure to exhaust administrative remedies and failure to plead fraud with particularity.

Regarding exhaustion of administrative remedies, Alert argues that New Hampshire did not follow appropriate proce-

dures in dealing with the Alert policy. Alert states that after Sciarra contested the cancellation of the Alert policy in January of 1991, New Hampshire did not have any contact with either AIPSO or the NJ Department of Insurance until 1992. Further, no formal appeal process was used at any time before New Hampshire instituted suit against Alert in October of 1992. Alert contends that the Insurance Commissioner should have ruled on any issues involving Plan policies before they were brought before the judiciary.

Again, the court does not see the Plan rules as establishing a mandatory avenue of administrative process that must be exhausted before resort to this court. Because Alert has not pointed to any other authority mandating exhaustion, Plaintiffs' claim will not be dismissed at this point in the litigation.

■ Alert next argues that New Hampshire's fraud count was not pleaded with requisite particularity. The Defendants cite the relevant portion of the Complaint as,

> The Plaintiff sues the Defendant in fraud. The insurance policy insured all of the Defendants' vehicles for liability. The schedule shows one tractor and five private passenger autos. To the best of Plaintiff's information and belief the defendant had thirty-five drivers, one truck, nineteen tractors and sixteen trailers.

Alert and Stuffo complain that there are no allegations that (1) the facts in the vehicle schedule were material to the underwriting of the policy; (2) Defendants knew that the schedule provided may have contained false information; (3) New Hampshire was ignorant of the supposed falsity of the representation; (4) Defendants intended Plaintiff to act upon the representation; or (5) New Hampshire relied upon Defendants' representations to its damage. The Defendants sum up their argument by stating,

Even if New Hampshire were able to prove the elements of common law fraud with subsequent evidence or discovery, the failure to make the requisite allegations in the complaint is fatal under the specificity requirements of Rule 9(b). Therefore, this Court should enter judgment in favor of Alert and Stuffo on this Count.

At this late date, however, mindful of the fact that discovery has already been conducted in this matter, the court finds that New Hampshire's Complaint contains sufficient factual specificity to have apprised Alert and Stuffo of the charges against them.

E. *Sciarra/Hopkins and their Clients' Counterclaims and ThirdParty Claims*

The parties have also submitted a number of summary judgment motions based upon Sciarra/Hopkins' and their clients' counterclaims and third-party claims. To the extent possible, these motions will be addressed individually as they appear under each of the three cases comprising this lawsuit.

1. *New Jersey Automobile Insurance Plan v. Sciarra*

a. *Plaintiffs and Third–Party Defendants AIPSO, Raymond A. Ursin, Travelers Indemnity Company, Fireman's Fund Insurance Companies, Liberty Mutual Insurance Company, Progressive Casualty Insurance Company, Aetna Casualty & Surety Company and New Hampshire Insurance Company for Summary Judgment* **[475]** *and Defendant/Third–Party Plaintiffs Sciarra/Hopkins' Cross-motion on the Antitrust Boycott Claim* **[476]**

i. *Count I—Antitrust Claim*

As discussed in this court's previous Orders, Sciarra/Hopkins' antitrust claim can only survive under the McCarran Act if the conduct they complain of constituted a

"boycott." The Third–Party Defendants here have moved for summary judgment on the antitrust count Third–Party Complaint, arguing that there is no genuine issue of material fact with respect to the absence of a McCarran Act boycott, especially in light of the fact that no movant refused to insure Sciarra/Hopkins' clients or rejected applications submitted by Sciarra/Hopkins. They further argue that no act pursuant to the alleged conspiracy to boycott occurred within the applicable four-year statute of limitations.

This court has discussed repeatedly the concept of boycott as it relates to this case, and what must be shown in order to establish that a boycott, in fact, occurred. Briefly reiterating, in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), the Supreme Court determined, 5–4, the "precise definition of the word 'boycott.'" *Id.* at 800, 113 S.Ct. 2891. The Court declined to define boycott as "an absolute refusal to deal on any terms." Instead, the Court stated that a boycott may consist of a refusal to deal where the refusal is conditional, and "offer[s] the target the incentive of renewed dealing if and when he mends his ways." *Id.* at 801, 113 S.Ct. 2891. However, the Court emphasized the distinction between a conditional boycott and a concerted agreement to seek particular terms in particular transactions. *Id.* at 802, 113 S.Ct. 2891. The Court offered the following illustration:

> [I]f Captain Boycott's tenants had agreed among themselves that they would refuse to renew their leases unless he reduced his rents, that would have been a concerted agreement on the terms of the leases, but not a boycott. The tenants, of course, did more than that; they refused to engage in other, unrelated transactions with Boycott— *e.g.*, selling him food—unless he agreed to their terms on rents. It is this expansion of the refusal to deal beyond the targeted transaction that gives great coercive force to a commercial boycott:

> unrelated transactions are used as leverage to achieve the terms desired.

*Id.* at 802–803, 113 S.Ct. 2891.

Further, the Court noted its opinion in *Eastern States Retail Lumber Dealers' Assn. v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), in which associations of retail lumber dealers refused to buy lumber from wholesale lumber dealers who sold directly to consumers. As a condition of buying from the wholesalers, the retailers required that the wholesalers "not sell in such a manner that a local retailer may regard such sale as an infringement of his exclusive right to trade." *Id.* at 611, 34 S.Ct. 951. The *Eastern States* Court held that the condition was a boycott because the "associations' activities ... sought an objective— the wholesale dealers' forbearance from retail trade—that was collateral to their transactions with the wholesalers." *Hartford Fire*, 113 S.Ct. at 2912–13.

The *Hartford Fire* Court noted that in only one case has the Court found that an alleged activity constituted a boycott within the meaning of the McCarran Act. *Id.* at 2914. In that case, *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), four insurance companies which controlled the medical malpractice insurance market agreed that three of the four would refuse to deal with the fourth company's policyholders, forcing them to accept the fourth company's new, restrictive rules of coverage. *Id.* at 552, 98 S.Ct. 2923. There, as the *St. Paul* Court found:

> This concerted refusal to deal went well beyond a private agreement to fix rates and terms of coverage, as it denied policyholders the benefits of competition in vital matters such as claims policy and quality of service. (citation omitted). St. Paul's policyholders became the captives of their insurer. In a sense the agreement imposed an even greater restraint on competitive forces than a horizontal pact not to compete with respect to price, coverage, claims policy, and ser-

vice, since the refusal to deal in any fashion reduced the likelihood that a competitor might have broken ranks as to one or more of the fixed terms.

*Id.* at 553, 98 S.Ct. 2923.

The *St. Paul* Court also emphasized that the insurer's conduct occurred outside of the regulatory scheme established by the state and the alleged conduct was not state authorized, but was instead a purely private attempt to control escalating damages claims. *Id.* at 553–54, 98 S.Ct. 2923. As such, the Court found that the conduct was a "boycott" under the McCarran Act. *Id.* at 554, 98 S.Ct. 2923. The *Hartford Fire* Court explained that, in *St. Paul,* the "insisted-upon condition of the boycott (not being a former St. Paul policyholder) was 'artificial': it bore no relationship to the proposed contracts of insurance that the physicians wished to conclude with St. Paul's competitors" and was, therefore, a boycott. *Hartford Fire,* 113 S.Ct. at 2914.

 With regard to the case at hand, in an Order dated October 24, 1995, this court wrote,

> [I]f the third-party defendants' conduct went beyond the asserted terms of the boycott and sought to refuse all applications from Sciarra/Hopkins' clients, regardless of the methodology used to compute the premiums and, as Sciarra/Hopkins alleges, sought to drive Sciarra/Hopkins out of business, this court may find that a boycott, in fact, occurred. Further, if the actual goal of the alleged "boycott" was a "price-fixing conspiracy," seeking to avoid the use of a valid methodology under the plan rules which did not involve Sciarra/Hopkins advocating that truckers make fraudulent statements on the insurance applications, then a classic boycott has occurred, subjecting the third-party defendants' conduct to federal anti-trust scrutiny.

After careful consideration of the record before the court at this time, however, the court simply does not see a boycott. The Third–Party Defendants have established that there was not a refusal to deal, but rather that Sciarra/Hopkins' clients applied for and received commercial automobile insurance from the servicing carriers of the Plans, albeit at a higher premium than they would have liked. Sciarra/Hopkins, on the other hand, have been unable to adduce evidence from which this court can conclude that a boycott occurred to allow this claim to go to trial. Again, at most, Sciarra/Hopkins' allegations constitute a concerted refusal to deal except on certain terms, and not a boycott, as explained by the United States Supreme Court in *Hartford.*[8]

The court notes that Sciarra/Hopkins' opposition brief is almost entirely argument comprised of mere denials and conclusory statements, insufficient to overcome a summary judgment motion. Where the record is referenced, citations are incomplete. For example, page 24 contains the following language: "Foremost is that the methodology itself did not violate the Plan rules, as Christopher Young, an AIPSO employee determined. Exhibit.'" Page 31 similarly reads:

> Third–Party Plaintiffs have offered a myriad of evidence on each of these factors sufficient to submit the reasonableness question to a jury for its determination. See Statement of Undisputed Facts/Appendix. For example, it is undisputed that the truckers' liability insurance market is very small, with few insurance companies involved. Exhibit. It is also undisputed that New Jersey and Pennsylvania promulgated the Plans to provide truckers, such as the Third–Party Plaintiffs, with an alternative way to secure less expensive insurance. Exhibit. Regardless of the state legisla-

**8.** Because the court has not found evidence of a legally cognizable boycott, we will not address the cross-motion's arguments of whether the Third–Party Defendants' conduct con-

stituted a horizontal restraint of trade or whether the alleged boycott should be deemed illegal per se.

tures' intents, the rates under the Plans did, in fact, rise. Exhibit.

It is not the court's responsibility to comb through the thousands of pages of exhibits annexed to the motions at hand in order to find support for a party's arguments. Rather, it is the responsibility of each party to support its own contentions with a proper basis in the record of the case. As set forth above, with regard to this motion, it was the responsibility of Sciarra/Hopkins to identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. As the non-moving party, Sciarra/Hopkins may not rest upon mere allegations or denials of its pleadings. Similarly, simply repeating that each issue is an issue of fact for jury determination will not defeat a summary judgment motion. In this instance, it is the opinion of this court that the plain language of Rule 56(c) mandates the entry of summary judgment against Sciarra/Hopkins because, even after adequate time for discovery, they have failed to make a showing sufficient to establish the existence of an antitrust boycott.

The Third–Party Defendants have also moved for summary judgment on the antitrust claim by arguing that the claim is barred by the four-year statute of limitations. They state that Sciarra/Hopkins discovered their alleged injuries and the existence of the alleged boycott by no later than April of 1990. They present the court with deposition testimony from Paul Hopkins and Justin Sciarra to the effect that in early 1990, they believed CAB was performing improper audits of trucking company clients in order for IINA to justify inflated premium demands designed to harm Sciarra/Hopkins. The Third–Party Defendants argue that Sciarra/Hopkins' actual knowledge of their alleged conduct precludes any tolling of the antitrust statute of limitations. Further, they argue that to the extent Sciarra/Hopkins claim that they were injured by any alleged boycott activities that took place after September of 1990, and therefore within the limi-

tations period, under *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 1990–91, 138 L.Ed.2d 373, Sciarra/Hopkins would have to show a continuing conspiracy and that these later activities caused harm over and above any harm caused by the earlier activities. Even then, argue the Third–Party Defendants, Sciarra/Hopkins still would not be permitted to recover for injury caused by acts outside the limitations period.

To rebut the statute of limitations issue, Sciarra/Hopkins simply state,

> Third Party Plaintiffs have adequately presented evidence which makes clear that they were unaware of the boycott misconduct because either third party defendants fraudulently concealed their wrongful activities or because Sciarra/Hopkins did not possess enough facts to determine that boycott activity was occurring. Certainly, if Sciarra/Hopkins did not muster the knowledge that a secret boycott against them was occurring, the truckers, who were only linked to the facts by their relationship to Sciarra/Hopkins could not know either. Regardless, any such considerations of the statute of limitations in this case should be left to the jury.

Again, there are no citations to the record. Sciarra/Hopkins do not support their conclusory arguments factually or by mandatory legal authority. In light of the fact that insufficient evidence of a boycott has been presented, the court need not reach the issue of statute of limitations. However, because Sciarra/Hopkins has failed to effectively rebut the motion on this issue, the court will use statute of limitations as an alternative ground for granting summary judgment on the antitrust claim.

### ii. *Count II—Product Disparagement*

The Third–Party Defendants next argue that Sciarra/Hopkins' product disparagement claim should be dismissed because there is no evidence in the record that any of the movants made any statement constituting actionable product disparagement

as to Sciarra/Hopkins. They further argue that even if any such statements had been made, those statements would be privileged.

■ As set forth in this Court's October 24, 1995 Order, the elements of the tort of product disparagement in New Jersey are 1) publication, 2) with malice, 3) of false allegations about the plaintiff's product or property, 4) that causes special damages. *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125, 161, 516 A.2d 220 (1986); *System Operations, Inc. v. Scientific Games Development Corp.*, 555 F.2d 1131, 1140 (3d Cir.1977). Additionally, the court again notes that statements charging "personal misconduct" or "reprehensible personal characteristics" at most are defamatory and are not actionable as product disparagement. *Kramer v. Monogram Models, Inc.*, 700 F.Supp. 1348, 1355 (D.N.J.1988), *rev'd on other grounds*, 875 F.2d 66 (3d Cir.1989). Rather, a product disparagement/injurious falsehood plaintiff must show "the publication of matter derogatory to plaintiff's business in general of a kind calculated to prevent others from dealing with plaintiff or otherwise to disadvantageously interfere with plaintiff's relations with others." *Binkewitz v. Allstate Ins. Co.*, 222 N.J.Super. 501, 516 n. 8, 537 A.2d 723 (App.Div.1988)(citing Prosser & Keaton, *The Law of Torts*, § 128, p. 963 (5th Ed.1984)). "[P]roduct disparagement protects injured plaintiffs, corporate or individual, by compensating them for pecuniary harm caused by false statements about their products." *Dairy Stores*, 104 N.J. at 158, 516 A.2d 220. However, defamation protects the plaintiff's "good name and character by compensating them for damage to their reputations." *Id.* As Justice Garibaldi explained in her concurring opinion,

> [I]f a defendant declares that a company refuses to pay its debts, the reputation of the company will be damages, but its ability to sell its product will not be. The statement is defamatory, but it does not disparage a product. (Citation omitted). In contrast, if a defendant says that a company's product is of poor quality, its sales will be hurt, but the public perception of its integrity and its reputation will not be affected. The statement disparages a product but it is not defamatory.

*Id.* at 158–59, 516 A.2d 220.

■ Mindful of the applicable law, then, this court finds that at this summary judgment stage, Sciarra/Hopkins have presented the court with insufficient evidence of product disparagement. As the movants point out, the truckers to whom the statements were allegedly made do not corroborate Sciarra/Hopkins' allegations and the parties who allegedly made the statements deny ever having done so, with no evidence having been presented to controvert such testimony. Third–Party Defendants further point out that Sciarra/Hopkins have failed to show special damages, and that, in fact, Hopkins' testimony established that Sciarra/Hopkins did not suffer any injury and did not lose any clients as a result of any allegedly disparaging remarks. Most importantly, however, even in opposing this motion, Sciarra/Hopkins have presented only statements which appear to be personal attacks, and have not provided evidence of statements which constitute attacks on their product. In fact, in their opposition brief, Sciarra/Hopkins state, "not a single party ever specifically stated that the methodology was illegal. Many, if not all of them knew when calling Sciarra and Hopkins "frauds," "scums," "slippery," "sordid," "crooks," "cheats," and other words to that effect, that the method was legitimate." Thus, evidence of the most basic element of the tort, false allegations *about the plaintiff's product*, is absent in this case, and summary judgment will be granted as to the product disparagement count.

### iii. *Count III—Tortious Interference*

Third–Party Defendants argue that Sciarra/Hopkins' tortious interference claim

should be dismissed because there is nothing in the record to indicate either that any movant intended to harm Sciarra/Hopkins or that any movant interfered with an actual contract or a reasonable expectation Sciarra/Hopkins held for specific additional business, or that any movant inflicted any harm on Sciarra/Hopkins without justification or excuse. Moreover, the Third–Party Defendants assert that any words which may be construed as tortious interference are qualifiedly privileged.

In opposing the motion, Sciarra/Hopkins refer to a contractual relationship which they had with "the Plans, AIPSO, the administrative agency for those Plans, and the servicing carriers which provided the insurance for the clients of Sciarra and Hopkins based on the applications that the producers submitted." They further state, "[i]t was 'reasonably probable' that Third–Party Plaintiffs would continue to profit from their relationships with Third–Party Defendants, and their own clients, had Third–Party Defendants not interfered with the relationship arrangement." In summarizing the damage they suffered, Sciarra/Hopkins state that "[t]hey suffered a loss in that they could no longer pursue business within the Plans after the Third–Party Defendants interfered with that pursuit of business."

■ Thus, in defending this portion of the motion, Sciarra/Hopkins refer only to actual or potential contractual relations they had with the Third–Party Defendants. However, "an action for tortious interference cannot be maintained 'where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship.' " *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 955 (D.N.J.1993) 838 F.Supp. at 956 (quoting *Fregara v. Jet Aviation Bus. Jets,* 764 F.Supp. 940, 955 (D.N.J.1991) (citations omitted)). Therefore, because the only contractual relations alleged to have been interfered with are those between the Third–Party Plaintiffs and the Third–Party Defendants, this claim cannot survive.

### iv. *Count IV—RICO Claims*

Finally, the Third-party Defendants argue that the federal RICO claims should be dismissed due to lack of evidence and because they are barred by the applicable four-year statute of limitations.

Regarding the statute of limitations argument, Sciarra/Hopkins argues that they did not know in 1990 that there was an actionable wrong being committed against them. They state, "while Sciarra and Hopkins believed the audits to be invalid, their knowledge of the fact that CAB was improperly auditing truckers did not mean that they knew of the injury that forms the basis of their civil RICO action." Sciarra/Hopkins further state,

Not until their attempts to amicably resolve the auditing disputes failed did Sciarra and Hopkins realize that there was a problem. Only after they brought CAB's bogus premium computations to the attention of the servicing carriers and the carriers did nothing to remedy the situation, and in fact continued to use CAB ignoring their pleas, did Sciarra and Hopkins realize that the conduct was being directed against them. Shortly thereafter, IINA filed this lawsuit and Sciarra and Hopkins finally knew to a certainty that the conduct that was effecting [sic] their trucker clients was really directed at them.

■ Initially, the court notes that Sciarra/Hopkins are mistaken in their belief that the statute of limitations does not begin to run until the point that they "know to a certainty" of conduct. The court finds that the deposition testimony presented in this case shows that Sciarra/Hopkins knew or should have known of both their injury and the alleged pattern of racketeering by early 1990 when they were aware of and counseled clients to avoid CAB's "hatchet job audits." Sciarra/Hopkins attempt to argue that fraudulent concealment operates to toll the statute of

limitations here because they were never notified that their methodology was considered by the Plans to be fraudulent. However, fraudulent concealment will not toll the statute of limitations here because if Sciarra/Hopkins were unaware, it is because they failed to exercise reasonable diligence.

■ The Third–Party Defendants also argue that Sciarra/Hopkins have no evidence to support a RICO claim under Section 1962(a) because there is no evidence that any alleged injury suffered by Sciarra/Hopkins was caused by the investment of racketeering proceeds in the alleged enterprise. In response, Sciarra/Hopkins argue that while the methodology was being reviewed for impropriety, Third-party Defendants continued to collect premiums. The argument continues:

> The premiums collected from [the truckers] amounts to racketeering income because the payments were made to the movants under false pretenses and were part of the larger scheme to defraud. This income provided movants with the opportunity to issue the initial policy knowing that they would then improperly audit those policies and assess the absurd premiums upon which they later sued.... This provided them with the means and the opportunity to further injure Sciarra/Hopkins and their clients.

The court fails to see here how it follows that the injuries allegedly suffered by Sciarra/Hopkins were caused by the investment of racketeering proceeds. Sciarra/Hopkins have not established a genuine issue of material fact with regard to their Section 1962(a) claim.

Next, the Third–Party Defendants argue that Sciarra/Hopkins' claim under Section 1962(b) must be disposed of at this stage because Sciarra/Hopkins cannot prove an injury caused by their acquisition or control of an enterprise in addition to an injury separate from that caused by the alleged predicate acts. Sciarra/Hopkins acknowledge that a 1962(b) plaintiff must show that he suffered an injury from the defendants' acquisition or control of an interest in the RICO enterprise, and that the defendants must have acquired the control as a result of the racketeering activity. However, Sciarra/Hopkins then simply state that they meet this element of the claim. Again, they do not explain *how* they have done so, nor do they cite to the record for a proper basis. As Sciarra/Hopkins have failed to identify, by affidavits or otherwise, specific facts sufficient to establish the existence of elements essential to a Section 1962(b) claim, this claim must fail.

Next, Third–Party Defendants argue that Sciarra/Hopkins' 1962(c) claim also must fail because Sciarra/Hopkins cannot prove "but for" and proximate causation. The theory is that Sciarra/Hopkins was not directly injured, as the Supreme Court required in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). That case held that a RICO plaintiff must prove that the defendant's violation of 1962(c) "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Id.* at 268, 112 S.Ct. 1311. To establish proximate causation, there must be "some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Id.* at 268–69, 112 S.Ct. 1311. Third–Party Defendants have characterized Sciarra/Hopkins' injury as lost business and commissions which forced them into bankruptcy. However, the increased premium demands made by the servicing carriers, they contend, did not injure Sciarra/Hopkins directly but rather through the trucking companies forced to pay the inflated premiums. Therefore, the argument is that Sciarra/Hopkins' injury "is contingent on the trucking companies first being injured, for it is the unwillingness of the

trucking companies to pay the premiums to the servicing carriers that resulted in the lost business and commissions". Third–Party Defendants argue that this is precisely the kind of indirect, attenuated causation that the Supreme Court rejected in *Holmes*. Additionally, Third–Party Defendants argue that because Sciarra/Hopkins still could have derived business from the voluntary insurance market, they cannot prove "but for" causation. Sciarra/Hopkins argues that because the Third–Party Defendants' conduct was specifically aimed at putting Sciarra/Hopkins out of business and preventing further use of their methodology, a reasonable jury could conclude that the insolvency of Sciarra and Hopkins was caused by the Third–Party Defendants.

■ Next, Third–Party Defendants argue that because Sciarra/Hopkins cannot prove a "scheme to defraud", since nothing was misrepresented or concealed, they are entitled to summary judgment on the Section 1962(c) claim. In response to the claim that there was no scheme to defraud because the basis for the increased premiums was fully disclosed, Sciarra/Hopkins argues that the disclosed basis was "bogus and incapable of being disproven by the injured parties until they were forced out of business." Sciarra/Hopkins continues, "The deception of IINA in this matter was its failure to deal fairly with Sciarra and Hopkins concerning the methodology and its participation in the back door scheme to punish the users of the method with the ultimate goal of driving them out of business." Sciarra/Hopkins state that the fact that they knew how the Third–Party Defendants had computed the premiums is irrelevant because the issue is why the premiums were assessed in the first place, not how they were assessed. The court agrees that Sciarra/Hopkins have not adduced evidence sufficient to establish a "scheme to defraud". After the movants demonstrated the absence of a genuine issue of material fact regarding this claim, Sciarra/Hopkins failed to adequately rebut

their arguments with support from the record.

Finally, Third-party Defendants argue that the New Jersey and Pennsylvania Plans cannot be held liable under 1962(c) because they are the alleged enterprises, and as such must be distinct from the defendant persons. Further, they argue that Sciarra/Hopkins may not allege aider and abettor liability because (1) they cannot establish their claim against the primary actors; (2) an aider and abettor claim against an enterprise would still violate the enterprise-person rule; and (3) they cannot prove that the Plans provided "substantial assistance" to CAB in performing the audits and to the servicing carriers in issuing premium demands.

■ In defending this portion of the motion, Sciarra/Hopkins argue that all or one of the NJ Plan, PA Plan, or AIPSO can be found to be the "enterprise", and then each individually named party would be liable as a "person" under RICO. The court disagrees with this argument. Sciarra/Hopkins have alleged, and have stated in their RICO case statement, that the NJ Plan and the PA Plan are the enterprises here. Therefore, they are not "persons" under the statute. Under the facts of this case, they may not flip from "enterprise" to "person" interchangeably. Sciarra/Hopkins next argue aider and abettor liability by simply stating,

First, for the reason stated above, this argument does not fail the "enterprise-person" rule. Second, based upon all the evidence presented above and in the accompanying Statement of Facts, the claims against the primary actor are clear. Third, the Plans allege that they did not "substantially assist" in achieving the violation of the primary actors. This is false on the plain facts. Again, the movants argue that the Plans did not provide assistance 'to CAB in performing the audits and to the servicing carriers in issuing the premium demands.' The Plans may not have performed the audits or issued the premium

bills, but they ratified and authorized the conduct at every turn.

Again, these simple denials and conclusory arguments are not sufficient to defeat a summary judgment motion. More importantly, however, the Third Circuit has recently found that there is no private cause of action for aiding and abetting a RICO violation. *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 656–57 (3d Cir.1998).

Lastly, Third–Party Defendants argue that any claim under 1962(d) must fail as a matter of law if the claims under 1962(a), 1962(b), and 1962(c) could not survive. Section 1962(d) provides: " It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Sciarra/Hopkins' Section 1962(a), (b), and (c) claims are not viable, and their claim under Section 1962(d) for conspiring to violate those sections will also be dismissed because even when viewed in a light most favorable to them, Sciarra/Hopkins have not shown the elements of a conspiracy.

 b. *Third–Party Defendants Indemnity Insurance Company of North America and Michael Scott's Motion for Summary Judgment* **[477]**

Indemnity Insurance Company of North America ("IINA") and Michael Scott joined in the above motion for summary judgment, but also filed a separate motion for summary judgment on individual issues. IINA and Scott argue that Sciarra/Hopkins' third-party claim against them under 18 U.S.C. § 1962(c) should be dismissed because they did not participate in the management or operation of the enterprises alleged by Sciarra/Hopkins. They claim that there is no evidence to suggest that either IINA or Scott engaged in the level of control over the New Jersey or Pennsylvania Plans that would impute liability under § 1962(c) of the Racketeering and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

 Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). The portion of this statute relevant to the instant dispute concerns whether IINA or Scott "conduct[ed] or participate[d], directly or indirectly, in the conduct of" the RICO enterprise.

The United States Supreme Court addressed this issue in *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). After considering the terminology Congress used as well as its context in the statute, the Court concluded:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

*Id.* at 179, 113 S.Ct. 1163. Employing this "operation or management" test, the Court held that plaintiffs' accountants did not participate in the alleged enterprise by merely failing to disclose certain information to plaintiffs' board. *Id.* at 186, 113 S.Ct. 1163.

Subsequently, the United States Court of Appeals for the Third Circuit, in *University of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir.1993), was asked to find that there was sufficient participation to substantiate

a RICO charge where a defendant accounting firm not only provided allegedly misleading financial data, but where it also provided additional professional services to the plaintiff. Adhering to the operation or management test of *Reves,* the court did not find sufficient participation, stating that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *Id.* The court held that "[t]here must be a nexus between the person and the conduct in the affairs of the enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in 'directing the enterprise's affairs' through a pattern of racketeering activity." *Id.* (quoting *Reves,* 507 U.S. at 179, 113 S.Ct. 1163).

■■■■ Thus, Third–Party Plaintiffs in this case must show that IINA and Scott not only were a part of the enterprise, but that they "knowingly engage[d] in 'directing the enterprise's affairs[.]'" *Id.* IINA and Scott have characterized the "affairs" of the Plan enterprises as follows:

> The affairs of the Plans involve the administration of applications for commercial automobile liability coverage. The Plans themselves are not insurance carriers and do not provide the insurance coverage sought by their applicants. Rather, the Plans receive applications for commercial automobile insurance from trucking companies and assign those applications to servicing carriers, such as IINA, who perform all underwriting and issue the liability insurance coverage, subject to the state approved rules and rates. In this regard, the Plans establish performance standards that the servicing carriers must meet. New Jersey Plan, § 25; Pennsylvania Plan § 15. Each Plan enforces the servicing carriers' compliance with Plan provisions and may refer servicing carriers to the insurance commissioner for violation of the servicing carrier standards. New Jersey Plan, § 24; Pennsylvania Plan § 15. The Plans do not participate in underwriting the policies of insurance, which is performed exclusively by the servicing carriers, nor do the Plans make underwriting decisions. (Affidavit of Janet Pritchett at ¶ 5) The Plans do hear appeals by trucking companies on actions taken by servicing carriers, in which case the Plan would rule on the propriety of those underwriting decisions.

IINA and Scott argue that they had no hand in managing, operating, directing, or controlling any of the affairs of the Plan enterprises. Rather, they provided services to the Plans by extending insurance coverage to Plan applicants, conducting *their own affairs* in IINA's dealings with the trucking companies. They point out that IINA issued policies in its own name, and made its own decisions regarding whether to conduct the audits, who should conduct the audits, and the calculation of premiums. IINA also issued the endorsements and bills for additional premiums following the audits. Scott was a representative of IINA, not an employee of the Plans. IINA and Scott argue that there is no evidence that the Plans played any role in IINA's decisions to audit Sciarra/Hopkins' clients or issue demands for additional premiums based on those audits, nor did IINA and Scott direct the Plan's affairs.

From all of the surrounding circumstances and drawing all inferences in favor of the Third–Party Plaintiffs, neither IINA nor Scott can be said to have "knowingly engage[d] in 'directing the enterprise's affairs through a pattern of racketeering activity." *University of Maryland,* 996 F.2d at 1539 (quoting *Reves,* 507 U.S. at 179, 113 S.Ct. 1163). As IINA and Scott point out, "[t]he *Reves* test clearly is not satisfied by mere involvement with the affairs of an enterprise; nor does it turn on the importance or essential nature of the defendants' conduct or activity in the affairs of the enterprise."

The court agrees that the record shows that the Plans did not play a role in IINA's decisions to conduct audits and make premium demands. In doing so, IINA conducted its own affairs, for which it cannot be held liable under *Reves.* 507 U.S. at 185, 113 S.Ct. 1163. Sciarra/Hopkins have not refuted the evidence in the record. Rather, in opposition to this motion, Sciarra/Hopkins state only:

IINA litigated against two other brokers who were like Sciarra/Hopkins on the AIPSO (Plain Managements') Return to Super list. This did not occur by coincidence. Each of these brokers was labeled a scam for reasons which we can only surmise may likewise be improper as was Sciarra/Hopkins' placement on the list. Scott in furtherance of the illegal objective of the Enterprise, was the center of a flurry of fraudulent activity, from fraudulent audits to fraudulent premium demands to defrauding state officials. For these services, Scott and IINA received money directly from the fruits of the fraudulent enterprise and through requests for extraordinary expenses incurred on behalf of the enterprise.

However, as IINA and Scott point out, Sciarra/Hopkins demonstrate no relevance under *Reves* to IINA's bringing lawsuits against other brokers. There is no evidence that IINA somehow manipulated the Plans in order to bring those lawsuits, nor is there evidence of any role played by the Plans in the decision to bring those lawsuits. Further, Sciarra/Hopkins have presented no evidence to contradict the affidavit that the Plans did not play any role in IINA's decisions to conduct audits and make premium demands. There is nothing in the record to contradict that in doing so, IINA conducted its own affairs. Finally, Sciarra/Hopkins have not cited any evidence of how IINA exercised control over the Plans to obtain the monies they refer to; IINA, on the other hand, has shown that, as a servicing carrier, it received money directly from the Plans

based on a clearly defined formula applicable to all servicing carriers. (NJ Plan, § 6; PA Plan, § 6) Also, there is no evidence that Scott received any money from the Plans. Even relying on additional arguments made on the record of oral argument, because the Third–Party Plaintiffs have not been able to point to "specific facts showing that there is a genuine issue for trial[,]" *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, summary judgment must be granted for Third–Party Defendants IINA and Scott on the 18 U.S.C. § 1962(c) claim.

c. *Third–Party Defendants Paul Arnold Associates, Inc. and Paul Goodman's Motion for Summary Judgment* **[469]**

Paul Arnold Associates and Paul Goldman have moved for summary judgment on the Third–Party claims that remain against them. They argue that discovery has made clear that their involvement in this case is so limited that justice requires that they be released from the case.

In a nutshell, Goldman, who worked for Arnold, agreed to assist his long-time friend, Charles Langner of the Dilks Insurance Agency (both of whom have been dismissed voluntarily from this case), in making an inquiry to the Board of Governors of the NJ Plan through Goldman's business associate, board member Robert Sheldon. Apparently, Langner was having a hard time putting on the Board's agenda an inquiry as to the propriety of the cost-of-hire methodology at issue in this case. Goldman has certified that his involvement was limited to bringing the issue of the methodology to Sheldon's attention and relaying his response back to Langner in December of 1986 and February of 1987. Goldman never indicated to Sheldon the name of the broker at which the Dilks inquiry was directed. In fact, neither Sheldon nor Goldman ever heard the names of Sciarra/Hopkins prior to this litigation.

Sciarra/Hopkins have also alleged that Goldman made a number of disparaging statements about Sciarra/Hopkins to Robert Sheldon. However, Sheldon has testified that Goldman never made such statements to him and Goldman has testified that he never made such statements to anyone. In addition, Sciarra and Hopkins each testified at their depositions that they were unaware of any proof that Goldman ever made any injurious statements against them.

Upon consideration of the submissions of the parties and their oral argument, the court concludes that Sciarra/Hopkins' federal antitrust boycott claim (Count I of the Third–Party Complaint) against Arnold and Goldman should be dismissed because there is no evidence establishing an antitrust boycott conspiracy by Arnold and Goldman. The boycott claim as to Arnold and Goldman appears to be time-barred in any event. Moreover, Sciarra/Hopkins' injurious falsehood/product disparagement (Count II) and tortious interference with contractual relations (Count III) claims will be dismissed as against Arnold and Goldman because Sciarra/Hopkins have not made a showing sufficient to establish the existence of the elements essential to these claims. In fact, they have not even opposed the motion on these two counts.

2. *New Hampshire Insurance Co., Inc. v. Alert Motor Freight*

a. *Plaintiff New Hampshire and Third–Party Defendants AIPSO, New Jersey Automobile Insurance Plan and James Bean's Motion to Strike Fourth-party Complaint or for Summary Judgment on the Fourth-party Complaint* [42]

This motion was made on the premise that Sciarra/Hopkins' Fourth–Party Complaint should be dismissed because Sciarra is not a defending party and therefore cannot assert Fourth–Party claims. Movants argue, in the alternative, that the Fourth–Party claims should be dismissed because: the federal RICO, antitrust, and defamation claims are barred by the applicable statutes of limitation; the federal antitrust claim is unsupported; the New Jersey antitrust claim is barred; and the RICO, negligence, and abuse of process claims are defective. They also argue that the product disparagement and tortious interference claims should be dismissed. Paul Verner, counsel for Sciarra, has represented to the court that this motion is unopposed. He has conceded this motion, stating that any claims he purported to bring under a Fourth–Party Complaint were "redundant of and subsumed by [the] pleadings" brought in the Third–Party Complaint, so the Fourth–Party Complaint is unnecessary. Therefore, this motion will be granted.

b. *Plaintiff New Hampshire Ins. Co. and Third–Party Defendants AIPSO, New Jersey Automobile Insurance Plan and James Bean's Motions for Summary Judgment as to Alert's Amended Third-Party Complaint* [41] and *Defendant/Third–Party Plaintiffs Alert Motor and John Stuffo's Cross-motion for Summary Judgment* [44]

Movants aver that Alert's antitrust boycott claim against them should be dismissed because it is barred by the four-year statute of limitations applicable to private antitrust actions. Movants contend that the only conduct that allegedly injured Alert was (1) New Hampshire's December 11, 1990 cancellation of an insurance policy it had issued to Alert on behalf of the NJ Plan and (2) New Hampshire's January 29, 1991 issuing of an endorsement to Alert for additional premium for the coverage that previously had been provided during the effective period for the policy. Because Alert's Third–Party Complaint was not filed until the fall of 1996, movants argue that the claim is time-barred. Alert did not respond to this argument in its opposition to the motion. Therefore, the court is able to grant the motion on statute of limitations grounds.

Alternatively, the movants argue that Alert's federal antitrust claim is barred by the McCarran–Ferguson Act, 15 U.S.C. §§ 1012–13, which provides that conduct is exempt from the federal antitrust laws if it (1) comprises part of the business of insurance; (2) is regulated by state law; and (3) does not constitute an agreement or act of boycott, coercion, or intimidation. Similarly, movants argue that Alert's claim under the New Jersey Antitrust Act is not cognizable because the movants' activities are clearly subject to regulation by the state's Commissioner of Insurance, and therefore the challenged conduct is statutorily exempt.

Alert and Stuffo, in opposition to this motion, state that they have "sufficiently offered allegations that Third-party Defendants were engaged in a boycott." However, despite being confronted with a motion for summary judgment, Alert does not point to any evidence that supports any such allegations. Instead, Alert goes into an analysis arguing that "when the state, not a private entity, performs anti-competitive conduct, the immunity does not apply." Alert states that because the Third–Party Defendants include state agencies, "the exemption" cannot apply. Alert then launches into an analysis of state action immunity, which is inapposite to this motion. Alert then argues that the Third–Party Defendants formed a group boycott, or horizontal refusal to deal, which was illegal per se because its purpose was to drive out competitors. To support this contention, Alert states that "Third–Party Defendants raised Alert's premium rates, calculated based upon estimates, and sued these parties, as part of a continuing scheme to drive Sciarra and Hopkins out of the truckers' liability insurance markets.... This activity, consequently, made it impossible for Alert to compete in interstate commerce." Alert then attempts to align its situation with that of *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), in order to show that it was subject to an illegal group boycott.

As with the New Jersey Auto case, the court fails to see the existence of a boycott here, as boycott has been defined by the Supreme Court.

■ Next, movants argue that Alert's injurious falsehood/product disparagement claim must be dismissed because there is no evidence in the record either that the services and products of Alert were ever disparaged by the movants or that Alert was specially damaged by any false statements by the movants, as there is no evidence that any customer of Alert ceased doing business with Alert because of any disparagement of its product or property by the movants. Movants also argue that, "to the extent the record contains any statements made by movants suggesting that Alert was less than truthful when applying for insurance through the New Jersey Plan, such statements are either absolutely or qualifiedly privileged."

Alert cites to the following statements as the basis for the injurious falsehood claim: (1) a handwritten note by New Hampshire's underwriter, James Bean, on the bottom of a fax cover sheet sent to a co-worker, dated July 12, 1990, which read:

> You have this assigned by this time— Just wanted to let you know—The Sciarra Agency is a very "slippery" agency— We believe there is a # of tractors/trailers not on our schedule which we are entitled to pick up on audit. Agent is telling us "no" since they are leased to another—We disagree & doubt the truth of this—You may want to alert the auditor assigned to this;

and (2) a November 8, 1990 New Hampshire memorandum from Bean to the same co-worker, stating:

> In reply to your [memorandum] of 10/25/90, if you have a procedure for handling situations in which the insured will not open their books to audit, let us know what it is. No one in this office is aware of such. In this situation, it is not our intent to let this matter die. There

is a lot of premium on this risk that was not shown in the policy, and to which we are entitled.

Alert contends that this is ample proof that the Third–Party Defendants made disparaging remarks that caused injury to Alert's business. Alert also contends that the Third–Party Defendants acted with malice because by failing to follow proper auditing procedures, they acted solely with a view toward injuring Alert's business, without any privilege. Regarding special damages, Alert contends that there is ample evidence that Alert was prevented from operating because it could not pay the excess premiums.

The court disagrees that the above letters provide ample proof that the Third–Party Defendants made disparaging remarks that caused injury to Alert's business. Because Alert has failed to establish each element of its product disparagement claim, summary judgment will be granted on this count.

Movants next assert that Alert's tortious interference claim should be dismissed because it is grounded upon the premise that New Hampshire and the other movants intentionally, and with malice, wrongfully caused Alert's policy of insurance through the New Jersey Plan to be canceled. However, movants argue that the record demonstrates that the only reason Alert's policy was canceled was because Alert intentionally and willfully refused to permit New Hampshire to audit Alert's operations, and then refused to pay the additional premium New Hampshire charged for Alert's policy. Further, there is no evidence in the record that any movant intended to harm Alert or that any harm was inflicted "without justification or excuse." Movants also argue that their verbal conduct is qualifiedly privileged, and that, in addition, Alert cannot prove causation or damages with regard to its tortious interference claim.

In defending this portion of the motion, Alert refers only to contracts it had with New Hampshire and the Third–Party De-

fendants. However, "an action for tortious interference cannot be maintained 'where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship.'" *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 955 (D.N.J.1993) 838 F.Supp. at 956 (quoting *Fregara v. Jet Aviation Bus. Jets*, 764 F.Supp. 940, 955 (D.N.J.1991) (citations omitted)). Therefore, because the only contractual relations alleged to have been interfered with are those between the Third–Party Plaintiff and the Third–Party Defendants, this claim cannot survive.

■ Movants argue that Alert's defamation claim is barred by the one-year statute of limitations applicable in New Jersey, because any allegedly defamatory statements must have been made in 1990 or 1991, and the claim was not filed until October of 1996. They further state that in *Lawrence v. Bauer Publishing & Printing, Ltd.*, 78 N.J. 371, 374–75, 396 A.2d 569, 571 (1979), the New Jersey Supreme Court rejected any argument that the "discovery rule" applies to libel and slander. That case states that N.J. Stat. Ann. 2A:14–3 expressly measures the limitations period from the date of publication of the alleged libel, not from the date of "accrual" of the claim, therefore, the discovery rule is inapplicable to libel actions.

In response, Alert states that it "brought these claims as soon as it had the knowledge necessary to allege such a claim." Alert alleges that it did not become aware of the comments at issue, which comments it still does not identify, until discovery commenced in this action, because the comments were fraudulently concealed. However, this explanation is insufficient to sustain this claim at the summary judgment stage. The court notes that Paul Verner, counsel for Alert, realized this and withdrew this claim at oral argument.

Next, movants argue that Alert's RICO claim is barred by the four-year statute of

limitations, even using the "injury and pattern discovery" rule, and that, nonetheless, it is wholly unsupported by the record. They argue that Alert knew or should have known of any injury and pattern at the time New Hampshire sought to audit Alert's operations and then demanded that Alert pay an additional premium or suffer cancellation of its policy. Movants note that under the Supreme Court's decision in *Klehr*, a plaintiff must exercise reasonable diligence in discovering his or her claim. *Klehr*, 117 S.Ct. at 1993 ("we conclude that 'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment'" to toll the statute of limitations on a claim).

Again, Alert's explanation is that it "brought these claims as soon as it had the knowledge necessary to allege such a claim," and that fraudulent concealment by the movants tolls the statute of limitations. Alert also states that because there are "issues of fact existing as to when and how Alert found out about the Third–Party Defendants' conduct that constituted the pattern of activity making up the RICO cause of action," the statute of limitations issue should be left to jury determination. At oral argument, counsel for Alert contended that the "pattern of unlawful debt collection" continued until October 15, 1992, by the initiation of this lawsuit.

Similar to the New Jersey Auto case, Alert has failed to adequately rebut the Third–Party Defendants' motion showing that Alert was or should have been aware of both its injury and the alleged pattern of racketeering over four years before it commenced this cause of action. Also, similar to the New Jersey Auto case, fraudulent concealment will not operate to toll the statute of limitations because if Alert in fact was unaware of the injury and pattern here alleged, the court finds that it did not exercise reasonable diligence.

Finally, the movants assert that Alert's negligence claim should be dismissed because there is no evidence in the record to support the claim and because Alert's coverage was canceled due to its own conduct. They argue that Alert has not asserted a duty of care owed by the movants which is distinguishable from the duties arising out of the New Hampshire insurance policy. Therefore, because New Jersey courts have consistently held that an independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself, Alert's negligence count cannot proceed.

Alert argues that the movants breached "a statutory duty" in failing to provide Alert with "reasonable" insurance. However, Alert does not cite to the statute from which this amorphous duty arises. At this stage of the litigation, Alert must do more than throw out vague and conclusory statements in order for its claims to survive. Rather, it must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Alert has not done so here.

On the above issues, Alert has repeatedly attempted to rest upon mere allegations or denials. As stated above, however, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. As such, summary judgment is mandated in this case against Alert Motor Freight and John Stuffo and in favor of the Third–Party Defendants.

3. *The Travelers Indemnity Co. v. E.F. Corp.*

 a. *Third–Party Defendants AIPSO, Pennsylvania Assigned Risk Plan and Raymond A. Ursin's and Central Analysis Bureau's Motions for Summary Judgment* [83, 85]

The Third–Party Defendants AIPSO, Pennsylvania Assigned Risk Plan and Ray-

mond A. Ursin have moved for summary judgment on E.F. Corp.'s Third–Party Complaint. The movants argue that E.F.'s RICO claims are barred by the applicable four-year statute of limitations, and that E.F. has no evidence to support its RICO claims based upon 18 U.S.C. § 1962(a)-(d). Further, movants argue that E.F.'s antitrust claims are barred by the statute of limitations and preempted by the McCarran Act, since E.F. has no evidence that it was the victim of a legally cognizable "boycott". Central Analysis Bureau has joined in this motion [83] and has argued, in addition, that E.F.'s federal RICO and antitrust claims should be dismissed because E.F. has not proved that CAB participated in the alleged conspiracies.

The Third–Party Defendants claim that E.F.'s alleged damages flow exclusively from the fact that its insurance policy with Travelers was not renewed as of June 10, 1990, as the result of an alleged conspiracy between Travelers and the Third–Party Defendants. Therefore, under either the "injury and pattern discovery" rule or the "injury discovery" rule, E.F.'s RICO claim and antitrust claim are time-barred, because they were not filed until September 28, 1995, more than four years after the claim had accrued.

They argue that fraudulent concealment does not apply here because E.F.'s president, Albert Evans, testified that E.F. was aware in mid–1990 of an alleged conspiracy to charge Sciarra/Hopkins' clients excessive insurance premiums with the alleged goal of forcing those trucking company clients out of the PA Plan and putting Sciarra/Hopkins out of business. Moreover, movants argue that this is not a "continuing violation" antitrust case in which a new act causing new injury occurs within the limitations period.

Movants also argue that E.F. cannot show Section 1962(a) RICO liability because there is no evidence of "investment injury." Likewise, they argue that E.F. cannot prove Section 1962(b) liability be-

cause there is no evidence that E.F. was injured as a result of movants acquisition or control of the alleged enterprise. Regarding the Section 1962(c) claim, movants argue that E.F. cannot prove a "scheme to defraud" because E.F.'s alleged damages were sustained by its own decision not to renew its policy. Also, they argue that there is no evidence that AIPSO, the PA Plan, or Ursin had anything to do with Traveler's calculation of E.F.'s premium. The PA Plan also argues that it cannot be held liable under 1962(c) because it is not a "person" distinct from the "enterprise." Finally, movants argue that because E.F. cannot state a claim under Sections 1962(a), (b), or (c), its claim under (d) must fail as a matter of law.

Next, movants contend that E.F.'s antitrust claim is barred by the McCarran Act. They argue that E.F. was not the victim of an unlawful boycott because (1) there is no allegation or evidence that the movants engaged in concerted activity against E.F. on collateral transactions with an intent of forcing E.F. to pay the allegedly excessive premiums; and (2) E.F.'s policy with Travelers was not canceled, but was non-renewed because E.F. refused to pay the Renewal Quote; thus, E.F. can make no allegation that the movants refused to deal with it on any terms.

■■ E.F. has opposed the instant motion, first arguing that regarding the antitrust claims, because a motion to dismiss was denied earlier in the case, this summary judgment motion should be denied as well. The court disagrees. Certainly the parties are well aware that different standards govern each type of motion, and a denial of a motion to dismiss for failure to state a claim within the pleadings does not preclude a motion for summary judgment on the basis of the evidence, or lack thereof, gathered during discovery.

Next, E.F. argues that there are genuine issues of material fact precluding summary judgment on E.F.'s antitrust boycott claim. E.F. cites to a Notice of Cancella-

tion that was issued a day before payment of the renewal premium was due, stating that this creates an issue of fact as to why E.F.'s insurance was canceled before the premium became due. E.F. also states that it paid Justin Sciarra an amount to be applied to the renewal premium before such premium was increased. Because Sciarra was acting as Travelers' agent and as Plan producer, E.F. argues this payment constituted payment to Travelers and the Plan. E.F. also cites to memos it has uncovered which refer to Sciarra as "a big time crook" and "NJ Producer Trouble", and to the fact that Travelers had demanded a second interim audit in the final month of E.F.'s policy to be performed by CAB, and when E.F. refused, Travelers used figures from E.F.'s predecessor to calculate an increased premium. E.F. argues that it was Travelers' intent to exclude E.F. from the PA Plan by artificially increasing its premium, such that E.F. could not pay the premium and would therefore be ineligible for coverage under the Plan. Therefore, argues E.F., there was "an absolute refusal to deal on any terms or a boycott to exclude E.F. from the Pa Plan." E.F.'s argument is summarized in its opposition brief:

> The facts in this case show that beginning in 1987, AIPSO and the PA Plan made a decision to stop Justin Sciarra and Paul Hopkins, the "South Jersey Agents," from continuing to sell a methodology or loophole which reduced premiums in the assigned risk plan. AIPSO and the PA Plan conspired and directed certain servicing carriers, including Travelers, to target the Sciarra applications and do whatever was necessary to purge Sciarra's insureds from the PA Plan. Travelers agreed to boycott Sciarra and its clients. Travelers published a[sic] "auto fraud warning" which sets forth the methodology or loophole Sciarra and Hopkins were using. (See Exhibit 9). During discovery, it was revealed by the auditing supervisor who prepared the "auto fraud warning" that there was nothing wrong

with this method, however, it reduced premiums which the insurance companies did not like. (See Kaljulaid Dep. at p. 104, Exhibit 7). Travelers communicated with AIPSO and the PA Plan regarding Sciarra's clients and directed the underwriters assigned to Sciarra's clients to perform any task to make them ineligible for coverage through the PA Plan.

E.F. further argues that the conspiracy to exclude E.F. from the PA Plan continued because Travelers demanded $10,000 from E.F. before it would even perform an audit, and then, after waiting until 1992 to perform the audit, Travelers waited another two years to calculate a final premium invoice. Further evidence of the conspiracy, argues E.F., is that Travelers created a double bill for E.F.'s premium, and finally, that Travelers initiated, and has continued to pursue, this lawsuit.

Again, the court does not see an antitrust boycott within the facts supported by the evidence of this case. The court finds that Travelers increased E.F.'s premium, a single incident, in June of 1990 and E.F. refused to pay. Therefore, the policy expired and was not renewed. There is a lack of evidence in the record either of a conspiracy or of a boycott against E.F. by the Third-party Defendants. Alternatively, the statute of limitations has run on this antitrust claim.

Next, E.F. opposes the motion by arguing that it has evidence of a "scheme to defraud", and therefore its Section 1962(c) claim is viable. However, E.F. has not opposed the motion regarding Sections 1962(a), 1962(b), or 1962(d). Therefore, summary judgment will be granted as to these claims.

With regard to Section 1962(c), the court finds that there is no evidence of a RICO violation by the Third–Party Defendants and that the statute of limitations has run. E.F. concedes that the statute of limitations for a RICO claim begins to run when the plaintiff knew or should have known

that the elements of the cause of action existed. E.F. further states that the elements of a RICO claim under 18 U.S.C. § 1962 are: the conduct of an enterprise through a pattern of racketeering activity which causes an injury to the plaintiff's business or property. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). E.F. argues that, at the very earliest, it only learned of the facts of the alleged conspiracy at the time this suit was filed. The court finds this argument disingenuous in light of the testimony of Albert Evans. Mr. Evans testified that he knew by June of 1990 that Sciarra/Hopkins' activities and clients were being targeted and that CAB was performing "hatchet job audits" on behalf of the Plans and carriers. He also testified that the reason for this treatment was to increase premiums and force E.F., as a Sciarra/Hopkins client, out of the Plan. This was the reason he gave for not allowing an audit of E.F. and for the deliberate decision not to pay the renewal quote. Thus, Evans also knew in June of 1990 that the policy was to expire without renewal because E.F. refused to pay an increased premium. The court finds that none of the theories for tolling the statute of limitations that E.F. advances apply here. E.F. knew or should have known of both its alleged injury and the alleged pattern of racketeering activity by June of 1990.

b. *Plaintiff/Third–Party Defendant Traveler's Motion for Summary Judgment on EF's Counterclaim* [88]

Travelers joined in the above motion for summary judgment by AIPSO, the Pennsylvania Assigned Risk Plan, and Raymond Ursin for dismissal of the RICO & antitrust claims, but also made a separate motion for summary judgment on the bad faith claim of the Third–Party Complaint, arguing that E.F. has failed to prove this claim of bad faith. Travelers' rationale for this motion is that (1) the Pennsylvania bad faith statute applies only to denials of claims, and does not apply to an insurance

company's underwriting activities; (2) E.F.'s own misrepresentations preclude the bad faith claims; and (3) the Pennsylvania bad faith statute cannot be applied retroactively. The court need not discuss this third ground, as E.F. concedes that acts prior to the July 1, 1990 effective date of Pennsylvania's bad faith statute may not be considered. However, it argues that the following acts committed by Travelers against E.F. after that date constitute bad faith: repeated demands for an excessive premium not based on E.F.'s records, but based on those of West Motor Freight; Travelers' initiation of a collection action for the excessive premium; the demand for a $10,000 payment before Travelers would even audit E.F.; Travelers' auditor's scheduling all leased vehicles simply because he believed the premium based on actual cost of hire was too low; not creating a premium invoice until almost two years after the audit; and the development of this invoice itself, which took place on or about July 11, 1994. E.F. also contends that the record indicates that Travelers' intent was to inflate the premium in order to make E.F. ineligible under the Plan and that Travelers' bad faith conduct continues each day of this litigation.

While "bad faith" is usually based on a failure to pay or process claims, fraudulent pricing practices have also been held to constitute bad faith under the Pennsylvania Unfair Insurance Practices Act ("UIPA") and therefore under Pennsylvania's Bad Faith Statute, 42 Pa.C.S.A. § 8371. *Rosengarten, Richmond, & Hevnor, P.C. v. United States Fire Ins. Co.*, 1996 WL 75891 *3 (E.D.Pa.1996)(citing *Turner Construction Co. v. First Indemnity of Am. Ins. Co.*, 829 F.Supp. 752, 763 (E.D.Pa.1993), *aff'd* 22 F.3d 303 (3d Cir. 1994)). The UIPA outlines the following as unfair acts or practices:

(2) Making, issuing, publishing or circulating in any manner an advertisement, announcement or statement containing an representation or statement with respect to the business of insurance

or with respect to any person in the conduct of his insurance business which is untrue, deceptive or misleading.

\* \* \* \* \* \*

(12) Making false or fraudulent statements or representations on or relative to an application for an insurance policy, for the purpose of obtaining a fee, commission, money or other benefit from any insurers, agent, broker, or individual.

■■■ At the least, E.F. seems to contend that statements were made to it in which Travelers misrepresented the cost of hire and misrepresented the policy premium, such as in the 1992 invoice, that Travelers made "false or fraudulent statements." Thus, the court declines to grant summary judgment on the suggested ground that the Pennsylvania bad faith statute applies only to denials of claims, and does not apply to an insurance company's underwriting activities.

■■■ Regarding the claim that E.F.'s own material misrepresentations on its application preclude the bad faith claims, the court notes that materiality is generally considered a mixed question of fact and law for the jury, but if reasonable minds cannot differ on the question of materiality, the court may resolve the issue at the summary judgment stage. *Jung v. Nationwide Mutual Fire Ins. Co.,* 949 F.Supp. 353, 357 (E.D.Pa.1997). In this case, there exist genuine issues of material fact regarding whether the misrepresented information on E.F.'s application was material and whether E.F. actually did the misrepresenting. Therefore, summary judgment will be denied.

c. *Defendant/Third–Party Plaintiff E.F.'s Motion for Summary Judgment* **[90]**

Finally, E.F. has moved for summary judgment. First, it requests summary judgment regarding the interpretation of "cost of hire." This argument was rejected above in the discussion of the New Jersey Auto case, and for reasons already stated, the court will not rule on this issue.

■■■ Next, E.F. argues that it should be granted judgment as a matter of law on its claim against Travelers for breaching its contract for insurance because Travelers improperly calculated E.F.'s premium in violation of the Pennsylvania Plan rules by disregarding its audit calculations and using a figure not based on E.F.'s operation. E.F. contends that during the last month of its policy, Travelers increased its premium by using a cost of hire figure derived from E.F.'s predecessor, West Motor Freight. Travelers contends that because information was misrepresented to it and because E.F. refused to allow Travelers to audit the policy, it was placed in a position of attempting to calculate a premium based on information available. Thus, because Travelers believed E.F. and its predecessor, West Motor Freight, were effectively one and the same, it used the numbers it had from previously insuring West Motor Freight. E.F. asserts that Travelers may not use as a defense the fact that E.F. did not allow an audit to be conducted in order to come up with an accurate figure for its operation because Travelers was attempting to have CAB, an outside agency, perform the audit, which is not provided for in the insurance policy. The court disagrees and finds that there exists a genuine issue of material fact with regard to whether E.F.'s own actions in refusing to allow an audit precipitated Travelers' difficulty in establishing an appropriate premium for the risk undertaken. The court agrees with Travelers that if E.F. provided false and misleading material information, tainting the insurance contract from the beginning, Travelers' subsequent efforts to obtain the appropriate information likely will not constitute breach of contract. Whether E.F. did provide false and misleading material information is a question of fact, therefore, summary judgment is denied.

E.F. also argues that it is entitled to summary judgment on its bad faith claim

against Travelers. Because E.F. has failed to meet its initial burden of establishing the absence of a genuine issue of material fact on this claim, summary judgment is precluded.

Finally, E.F. has moved for summary judgment on Travelers' Complaint because the damages are based on the July 11, 1994 invoice which Travelers "has conceded ... is excessive and inaccurate", therefore, "Travelers has produced no competent evidence to support the damage it claims." However, the court finds that there is sufficient evidence in the record for Travelers to proceed on a claim that the premium was underpaid.

An appropriate Order will issue.

### ORDER

For the reasons expressed in the accompanying Opinion, as well as those expressed on the record during oral argument on November 4, 1998,

IT IS ORDERED on this *30th* day of December, 1998, that the motion made by Defendants/Third–Party Plaintiffs Justin M. Sciarra, Sciarra Ins. Agency, Inc., Paul W. Hopkins, Hopkins & Assoc., Inc., Phila. Ins. Exchange, Inc., Alert Motor Freight, John Stuffo, R.G. Truck Leasing Co., Inc., Ardan, Inc., and Reisch Enterprises, Inc. for partial summary judgment on Sciarra/Hopkins' methodology [465] is hereby *DENIED.*

IT IS FURTHER ORDERED that the motions made (1) by Defendants Justin M. Sciarra, Sciarra Insurance Agency, Inc. Paul W. Hopkins and Hopkins & Associates, Inc., Philadelphia Insurance Exchange, Inc., Reisch Enterprises, R.G. Trucking, Inc., and Ardan, Inc. and (2) by Defendants/Third–Party Plaintiffs Alert Motor Freight and John Stuffo for summary judgment dismissing Plaintiff's Complaint [461, 463, 38] are hereby *DENIED.*

IT IS FURTHER ORDERED that the motion for summary judgment made by Plaintiffs/Third–Party Defendants AIPSO, Raymond A. Ursin, Travelers Indemnity

Co., Fireman's Fund Insurance Cos., Liberty Mutual Ins. Co., Progressive Casualty Ins. Co., Aetna Casualty & Surety Co., & New Hampshire Ins. Co. [475] is hereby *GRANTED.*

IT IS FURTHER ORDERED that the cross-motion for summary judgment by Defendants/Third–Party Plaintiffs Sciarra/Hopkins [476] is hereby *DENIED.* It is noted that the portion of this motion requesting leave to amend the Third–Party Complaint under Fed.R.Civ.P. 15(b) was struck by this court on February 17, 1998.

IT IS FURTHER ORDERED that Third–Party Defendants Indemnity Insurance Company of North America and Michael Scott's motion for summary judgment on the 18 U.S.C. § 1962(c) claim [477] is hereby *GRANTED.*

IT IS FURTHER ORDERED that the motion made by Third-party Defendants Paul Arnold Assoc., Inc. and Paul Goldman for summary judgment on the Third–Party Complaint [469] is hereby *GRANTED.*

IT IS FURTHER ORDERED that the motion of Plaintiff New Hampshire and of Fourth–Party Defendants AIPSO, NJ Auto Ins. Plan, and James Bean to strike the Fourth–Party Complaint or for summary judgment on Sciarra/Hopkins' Fourth–Party Complaint [42] is *GRANTED,* as Paul Verner, counsel for Sciarra, has represented to the court that the motion is unopposed and conceded.

IT IS FURTHER ORDERED that the motion by Plaintiff New Hampshire and Third–Party Defendants AIPSO, New Jersey Auto Insurance Plan, and James Bean for summary judgment as to Alert's Amended Third–Party Complaint [41] is hereby *GRANTED.*

IT IS FURTHER ORDERED the cross-motion by Defendants/Third–Party Plaintiffs Alert Motor and John Stuffo for summary judgment [44] is hereby *DENIED.*

IT IS FURTHER ORDERED that the motion of Third–Party Defendants AIPSO,

Pa. Assigned Risk, Plan, and Raymond A. Ursin for summary judgment on E.F.'s Third–Party Complaint [85] is hereby *GRANTED*.

IT IS FURTHER ORDERED that the motion of Third–Party Defendant Central Analysis Bureau Inc. for summary judgment[83] is hereby *GRANTED*.

IT IS FURTHER ORDERED that the motion of Plaintiff/Defendant on the Counterclaim Travelers Indemnity Co. for summary judgment on the counterclaim [88] is hereby *GRANTED IN PART, DENIED IN PART*. The motion is denied as to the bad faith claim contained in the Counterclaim, but is granted as to the other counterclaims brought by E.F. Corp. against Travelers.

IT IS FURTHER ORDERED that Defendant/Third-party Plaintiff E.F. Corp.'s motion for summary judgment[90] is hereby *DENIED*.

IT IS FURTHER ORDERED that the Plaintiff/Third–Party Defendants' motion to strike portions of the authentication affidavits submitted in behalf of Sciarra/Hopkins, Alert Motor Freight, and John Stuffo [497, 502] is hereby *DENIED*.